(69 App. Div. 160.)

CHILDS v. COMSTOCK et al.

(Supreme Court, Appellate Division, First Department. February 14, 1902.)

1. ATTORNEYS—BREACH OF CONTRACT—PROTEST AGAINST CUSTOMS DUTIES.

　　Attorneys of an importer in the matter of his protest against the im-position of customs duties having agreed to take all steps requisite in regard thereto, and to prosecute it to a conclusion, are put on inquiry as to whether a decision has been rendered by the appraisers, having knowledge that a decision has been rendered on a protest by another involving the same question, and argued with it, so that, having done nothing in regard to appeal from the appraisers' adverse decision till after lapse of time therefor, they are liable for damages, in the absence of understanding or agreement that notice of the decision, if sent to the importer, as was the case, should be forwarded by him to them.

2. SAME—INFORMATION FROM COLLECTOR'S OFFICE.

　　Attorneys of an importer in the matter of a protest against imposi-tion of duties are not prevented from learning whether a decision there-

on by the appraisers has been rendered and filed in the office of the collector of customs by the rule of the treasury department that subordinate officers of customs are not permitted to give other than necessary, information relative to public business, except to persons entitled to demand it, nor to grant inspection of public records or information therefrom to others than official persons entitled to the privilege.

**8. SAME—CONTRIBUTORY NEGLIGENCE OF CLIENT.**

Though attorneys for several importers in the matter of protests against imposition of customs duties told one of them, if he got notice of the decision of the appraisers, to send it to them, another importer is not prevented by contributory negligence from holding the attorneys liable for failure to seasonably appeal from the decision of the appraisers, though he was in hearing distance of such conversation, in the absence of understanding or agreement between him and the attorneys that he should send the notice to them.

**4. BREACH OF CONTRACT—DAMAGES—EVIDENCE.**

It is sufficient evidence of damages from failure of attorneys to appeal from decision of the appraisers on protest against imposition of customs duties on dead oil as distilled oil that on appeal from another decision made at the same time, and involving the same question, it was held that it was not distilled oil, but was entitled to entry free of duty.

**5. APPEAL—EXCEPTIONS.**

Exception to so much of the charge as allowed the jury to add any interest is not sufficient to present for review the question whether they were allowed to add interest for too long a period.

**6. BREACH OF CONTRACT—AMOUNT OF DAMAGES.**

Attorneys who have failed to prosecute appeal from decision on protest against imposition of duties, under agreement that they should have for compensation 25 per cent. of recovery, are liable only for 75 per cent. of what they would have recovered.

Appeal from trial term, New York county.

Action by Eversley Childs, surviving partner, against Albert Comstock and another, partners as Comstock & Brown. From judgment on a verdict for plaintiff, and from an order denying defendants' motion on the minutes for a new trial, defendants appeal. Modified.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Robert M. Boyd, Jr., for appellants.
William N. Niles, for respondent.

LAUGHLIN, J. This is an action for damages caused by the failure of the defendants, as attorneys, to appeal from a decision made by the United States board of appraisers within the time allowed by law. In the years 1895 and 1896 the firm of which plaintiff is the surviving partner was doing business under the firm name of Mica Roofing Company, and, in connection with its business of distilling coal tar, it made certain importations of "dead oil" or "coaltar product." The collector of the port of New York held that these importations were "distilled oils," within the meaning of paragraph 60 of the tariff act of 1894, and subject to a duty of 25 per cent. ad valorem. The importers, through Kennedy & Moon, a firm of custom-house brokers, filed protests against the exaction of such duties, and the same were transmitted in the usual manner by the collector to the board of general appraisers for a hearing on the correctness of his decision. On the 11th of June, 1896, the defendants wrote

Messrs. Kennedy & Moon, asking if they might take the claims of the Mica Roofing Company in hand on the usual basis, and saying that they had been asked to act on some claims of other parties concerning the same product. The brokers brought the matter to the attention of plaintiff's firm, and subsequently advised the defendants that the application was received with favor. Thereupon defendants addressed a letter to the Mica Roofing Company under date of June 12, 1896, which, so far as material, is as follows:

"Dear Sirs: Messrs. Kennedy & Moon advise us that you are willing we should take in hand your protests as to exactions of custom duties on so-called coal-tar oil or dead oil, which is now at a stage of progress represented by the fact that the protests have been lodged and are waiting the decision of the general appraisers, and should prosecute the same to a conclusion, upon the understanding that we are to take all such steps as may be requisite, both on the cases now pending and on any further importations which you may make pending the final decision of the question; that we are to receive a fee of 25% on whatever sums may be recovered as a result of the contest, and are to look to you for no compensation whatever unless the matter should result in recovery. * * * If the terms herein stated properly express your understanding of the matter, please advise us to that effect."

The Mica Roofing Company replied thereto on the 15th day of June, 1896, as follows:

"Dear Sirs: We have yours of the 12th regarding bringing suit against the government for the recovery of duty which we have paid on dead oil. We have to say in regard to the matter that you are entirely right. We desire that you go ahead at once with the suits, and we will stand to our agreement of allowing you 25% of all recovery; nothing to be paid unless suit results in recovery."

This correspondence constitutes the contract between the clients and attorneys which is the basis of the action.

On an appeal to the circuit court of the United States taken by defendants for the Warren Chemical Manufacturing Company, whose protests were similar, and were heard with plaintiff's by the board of general appraisers, the decision of the appraisers sustaining the imposition of duties by the collector was reversed, and this reversal was affirmed by the United States circuit court of appeals. U. S. v. Warren Chemical & Mfg. Co., 84 Fed. 638. The respondent contends that, if an appeal had been taken on his protests, he, also, would have recovered the duties paid. He assigns as a breach of contract, and for his cause of action, the failure of defendants to take such appeal within the 30 days allowed therefor after the decision of the board of appraisers (section 15, c. 407, Stat. 1889-90), and he seeks to recover as his damages the duties paid, and interest thereon.

The hearing before the board of general appraisers was on the 26th day of June, 1896. The defendants, in behalf of the importers, contended that "dead oil," although produced from coal tar by a process of distillation, was entitled to free entry under paragraph 443 of the tariff act of 1894, and not subject to a 25 per cent. ad valorem duty, as "distilled oil," under paragraph 60 thereof. On the 23d day of July, 1896, the board of general appraisers rendered a decision in writing sustaining the collector on many of the protests concerning which they had taken evidence in this matter, a schedule of

which was annexed thereto. It included the plaintiff's protests and
those of the Warren Chemical Manufacturing Company and others.
This decision was, according to the usual custom, transmitted to and
filed with the collector. It was the custom of the board on making
a decision to send out notices to those in interest. Where the protest
is filed by an attorney or broker, the notice is ordinarily sent to him,
and in other cases to the importer. These notices are not required
by law, and they merely announce the date of the decision on the
protests, a schedule of which is annexed, but give no information as
to how the matter has been decided, and on that point say, "The de-
tails can be ascertained on application to the collector of customs at
New York." It was shown to be the custom of importers and brok-
ers on receiving such notices to send them to the attorneys, but it
does not appear that plaintiff's firm was familiar with such custom.
On receiving such a notice, either direct or through their client or
his broker, it is the custom of attorneys practicing that branch of the
law to send a clerk to the collector's office to copy the decision and
the schedules of protests, so far as they relate to the importer on ac-
count of whose protest the notice is·sent, and file the same in their
office as a ground for appeal proceedings if the protest has been
overruled. Under date of July 23, 1896, such a notice was received
by the Mica Roofing Company, and their clerk was sent to the col-
lector's office to ascertain how the matter was decided; and then the
notice was filed away, and not delivered to defendants until an in-
quiry arose concerning it about the 14th of September, 1896. Ap-
pellants also represented the Warren Chemical Manufacturing Com-
pany on its protests heard on the same evidence and at the same time.
That company received a notice from the board of general apprais-
ers announcing a decision on its protests, and transmitted it to de-
fendants. Upon receiving this notice, defendants pursued the usual
course, and sent their clerk to the collector's office to ascertain what
the decision was. It does not appear that they obtained a copy of
the decision, and they claim to have learned its contents only so far as
it related to the Warren Chemical Manufacturing Company. The
defendants selected the Warren Chemical Manufacturing Company
protests for a test case, and duly took an appeal in time. That com-
pany's imports were also products of coal tar known as "dead oil,"
and were of the same general character as plaintiff's, and considered
the same for dutiable purposes. The defendants were experts in that
line of business, and, aside from these protests, they represented a
very large percentage of all protests filed against the imposition of
tariff duties that were heard before the board of general appraisers.
They were familiar with the practice of the government officials, and
aware of the risk in relying on the irregular practice in the transmis-
sion of notices of their decisions by the board of general appraisers.
Appeals in such cases are taken by attorneys, and it does not appear
that the execution by the client of any papers or documents is essen-
tial thereto. The appellants expressly concede in their points that
"the plain and obvious meaning of the contract was that, should the
decision of the board of general appraisers be adverse to the plaintiff,
the defendants should appeal from such decision." Their contention

is that they had no means of obtaining knowledge of the decision, other than by the notice which in this case was sent to their client, and they base this contention upon a rule of the treasury department which provides that:

"Subordinate officers of customs are not permitted on their own authority to give other than necessary information relative to the public business, except to persons entitled to demand it; nor to grant inspection or copies of public records or documents, or information obtained therefrom to other than official persons entitled to the privilege."

The collector of customs of the port of New York is not, we think, a subordinate officer of customs, within this rule; and nothing in the rule could be construed as prohibiting him from giving information asked by importers or their attorney as to the contents of the decision of the board of general appraisers filed with him. Further than this, the rule expressly permits the subordinate officers to give necessary information relative to the public business, and to give any information to persons entitled to demand the same. It is manifest that the attorneys who conduct the proceeding for a client before the board of general appraisers are authorized to receive information as to the nature of the decision, or as to whether a decision had been made on the protests filed by their clients. When the defendants received notice that a decision had been made on the protests filed by the Warren Chemical Manufacturing Company, they sent their clerk to inspect the decision. A careful inspection of the decision at that time would have shown that the board had decided on all of the protests filed in behalf of the plaintiff as well. While it appears that the board did not universally decide all protests heard at the same time and concerning the same matter, it is evident that they ordinarily would. The protests having been based upon the same grounds and with respect to a similar product, when the attorneys had notice of a decision in one case they were put upon their inquiry as to whether a decision had not been made in the other. Their liability depends upon their contract. They expressly agree "to take all such steps as may be requisite, both on the cases now pending and on any further importations," and to "prosecute the same to a conclusion." They did not limit their liability to receiving notice from their clients, and we think the court was justified in saying to the jury that it was their duty to inspect the decision, and that they were chargeable with the knowledge that would have been obtained by such inspection. They seek to relieve themselves of this liability by a conversation in the presence of the senior member of plaintiff's firm, since deceased, between the defendant Comstock and one Comer, an importer whom the defendants also represented. This conversation took place immediately after the hearing before the general appraisers, and outside the room, where seven or eight parties interested in the appraisal were waiting for the elevator. Mr. Comer testified that he asked Mr. Comstock how he would know about the decision when rendered, and that Comstock replied that he was liable to receive the notice direct himself, or that it might be sent to "us; if it came to us, to send it to him." In answer to the question, "Was anything said in regard to the importance of letting him

know?" the witness answered, "Certainly, as there was only a limited time allowed for appealing." The witness further testified, "I told Mr. Comstock that if I got the notice I would send it to him." It did not appear that the deceased member of plaintiff's firm took part in the conversation, nor does it appear that his attention was drawn thereto otherwise than that he stood close to Mr. Comstock, and within hearing distance. The court charged the jury, in substance, that if that conversation took place, and if there was an understanding or agreement between the decedent and Mr. Comstock by which the former was to send the notice to the latter, then the defendants were excused from ascertaining that a decision had been made adverse to the protests of their clients, but otherwise not. This, we think, is the correct rule of law, and the finding of the jury on the facts to which it related is adverse to the defendants. It thus appears that, without any understanding or agreement with their clients that a notice which might be sent to their clients should be forwarded to them, the defendants took no steps to ascertain whether a decision had been rendered in their clients' cases. They did nothing until after the time to appeal had elapsed. This, we think, rendered them liable on the contract for the damages sustained by their clients. The court, we think, properly refused to charge the jury that if, in their opinion, the plaintiff's firm was guilty of contributory negligence in not forwarding to the defendants the notice received, the plaintiff could not recover. This request eliminated from the consideration of the jury the question as to whether plaintiff's firm had been requested to forward such notice, or had agreed so to do. The court, however, immediately thereafter, did instruct the jury that, if the defendant Comstock notified the plaintiff's firm to forward all notices and papers received regarding the case before the board of general appraisers, it was negligence on their part not to do so. If this request, as made, did not fully instruct the jury as to the effect of that negligence, the fault lies with the defendants, and not with the court; but it is evident that the jury would understand that in such event the plaintiff could not recover.

It quite clearly appears that the decision of the circuit court and of the circuit court of appeals on the appeal taken by the Warren Chemical Manufacturing Company, was stare decisis on the proposition that the products imported by plaintiff's firm, and concerning which protests were filed, were not dutiable; and, as the court said to the jury in this case, it is reasonably certain that, if an appeal had been taken and prosecuted, the decision of the board of general appraisers would have been reversed. These decisions were to the effect that "dead oil," although produced from coal tar by a process of distillation, was known neither commercially nor scientifically as "distilled oil," and it was therefore entitled to be entered free of duty. It is strenuously insisted that the government would not necessarily conform to the decision of the court as to importations falling within the principle upon which the adjudication was had, and evidence was offered that other importers were obliged to pay duties on similar products. This evidence was excluded, and defendants excepted. The fact that the customs officials were overzealous in exacting

duties, or failed to properly interpret the decision of the court, was of no consequence. The material point is that the rights of the plaintiff's firm could have been secured and enforced by an appeal. The various exceptions, therefore, taken to the admission of evidence, and to the charge, and to the refusal of the court to charge, upon this subject, present no prejudicial or reversible error.

The amount of duties paid which the plaintiff has been allowed to recover is $2,003.75. Interest was computed on this amount from the 20th day of January, 1898; that being the date of the mandate of the circuit court of appeals. In the Warren Chemical Manufacturing Company Case, after the decision of the circuit court or circuit court of appeals, the duties paid by it were repaid; but the date of such repayment was not shown. The defendants' counsel excepted to so much of the charge as allowed the jury to add any interest. This exception is urged upon the ground that the government does not allow interest on duties which it repays. Doubtless interest could not be recovered, except from the date upon which it might be found that the duties would have been repaid had the appeal been taken and prosecuted to a successful termination with due diligence; but the exception is not sufficient to properly present the question. The case was submitted to the jury on the 26th day of April, 1900. It might, we think, be fairly assumed that the duties would have been repaid before that time, and therefore the plaintiff was entitled to recover some interest. It might have been a question for the jury to say what would have been a reasonable time in which the duties would have been repaid, but no such question was presented.

The plaintiff has been allowed to recover the full amount of the duties paid. The action, as has been seen, is for damages for a breach of the contract, which, if performed, would only have resulted in the recovery of 75 per cent. of the duties for the benefit of the plaintiff. We think the damages should be limited according to the contract which is the basis of the action.

We have examined the other questions presented, but we find none which requires extended consideration.

It follows that, if the plaintiff will stipulate to reduce the judgment, including interest, costs, and extra allowance, to the sum of $1,950.23, the judgment as so reduced, and the order appealed from, should be affirmed, without costs; otherwise, the judgment and order should be reversed, and a new trial had, with costs to appellants to abide event. All concur.