## CHARLES LAWRENCE CHRISTY v. SAMUEL SALITERMAN.

179 N. W. (2d) 288.

August 7, 1970—Nos. 41562, 41563.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II, Burr B. Markham, Dorsey, Marquart, Windhorst, West & Halladay, Peter Dorsey,* and *Jan D. Stuurmans,* for appellant.

*Thomas F. Burns & Associates,* for respondent.

UPON REARGUMENT

MURPHY, JUSTICE.

This is an appeal from a judgment in favor of plaintiff and against defendant in the sum of $157,158.54 and from an order of the trial court denying defendant's motion for a new trial in a legal malpractice action. Defendant contends that the verdict is not supported by the evidence; that the medical expert who testified in behalf of plaintiff was not qualified; that the court erred in allowing opinion evidence in response to a hypothetical question which allegedly contained data not in evidence; that recovery should have been limited to the actual amount that would have accrued to plaintiff had defendant attorney diligently pursued a medical malpractice action to a successful conclusion; and that the amount of the verdict is excessive.

From the record it appears that plaintiff, Charles L. Christy, an automobile salesman, 37 years of age at the date of the occurrences which are the subject of this action and the sole support of his wife and nine children, underwent surgery on January 2, 1961, for repair of a hiatus hernia. Despite the apparent success of this operation, plaintiff entered a stage of mental depression. He contacted Dr. Leslie Caplan, a psychiatrist, on January 8, 1961. Dr. Caplan discovered that plaintiff had a history of periodic intemperate consumption of alcohol and medications. The doctor sent him to Glenwood Hills Hospital on March 1, 1961, and his hospital admission form contained the diagnosis, "Acute anxiety reaction." Plaintiff made some improvement and was discharged on March 10, 1961. Dr. Caplan's discharge sum-

mary noted that plaintiff requested his release in order to return to work.

Plaintiff was rehospitalized on April 13, 1961. Dr. Caplan's medical history stated that Mr. Christy had resumed his consumption of beer and, in turn, had suffered a recurrence of stomach pain and nervous anxiety. He was discharged on April 21, 1961, again upon his expressed desire to alleviate his pressing financial needs. Plaintiff was readmitted on May 27, 1961, under a diagnosis, "Severe Anxiety State with Depression." His hospital record disclosed his claim that "all of a sudden, a week ago he became intensely nervous and has been unable to eat ever since." On or about May 31, plaintiff discharged Dr. Caplan and employed Dr. Robert Cranston, also a psychiatrist, as his attending physician. Plaintiff was discharged on June 10, 1961, of his own volition in order to return to work. Dr. Cranston noted on his discharge summary that plaintiff was "not improved." Plaintiff reentered the hospital on June 17, 1961. His admission record stated that he had consumed several beers that morning, had attempted to ride his child's bike, and had tumbled on his face.

As was the occasion on each of his other hospitalizations at Glenwood Hills Hospital, plaintiff received a treatment involving the administration of drugs, barbiturates, and tranquilizers. In addition, he underwent seven electroshock treatments. These were administered on June 29 and 30, and July 1, 3, 5, 7, and 10. Dr. Cranston had scheduled another treatment for July 12, but, because plaintiff's credit was terminated at the hospital, the doctor rescinded the order and discharged plaintiff during the afternoon of July 10.

The discharge was accomplished over the phone. Informed of the doctor's order, Mrs. Christy went to the hospital and accompanied her husband home. They stopped at a drugstore where one of them telephoned Dr. Cranston in order to obtain medication for plaintiff. Dr. Cranston prescribed 2 ounces of paraldehyde to be taken in dosages of 1 teaspoonful every 6 hours as

needed and 15 tablets of 50 mg. mellaril, one to be taken twice daily at 8 a. m. and 6 p. m.

That evening plaintiff visited with his family until about 10 p. m., at which time his wife gave him a dosage of paraldehyde. Since paraldehyde is a quick-acting, sleep-inducing hypnotic, plaintiff retired immediately. Approximately 4 hours later, the Christys' son, Michael, awoke to the smell of smoke and discovered his father sitting in a blazing chair in the family's living room. Michael pulled his father from the chair and extinguished the flames. However, plaintiff suffered second- and third-degree burns over 30 percent of his body. Ten surgical procedures were required to debride the burned area and apply split-thickness skin grafts. In addition, plaintiff's right elbow was rendered unfunctional.

On the morning of July 11, Mrs. Christy discovered that the bottle of paraldehyde had been removed from the medicine shelf on which she had placed it the previous evening and had been placed in the refrigerator. She was uncertain whether she had given plaintiff the proper dosage (1 teaspoonful) or double that amount (1 tablespoonful) the evening before. In any event, the bottle, which held approximately 16 teaspoonfuls, now contained only about half that amount.

The Christys contacted defendant, Samuel Saliterman, an attorney, and visited his office in November 1961, regarding his retainer as counsel in a suit against Glenwood Hills Hospital and Dr. Cranston for medical malpractice. However, no action was filed within 2 years as is required by Minn. St. 541.07. Plaintiff then brought this action for legal malpractice.

By special verdict, the jury found that Dr. Cranston was negligent in his discharge of plaintiff on July 10, and in his administration and supervision of the medications he prescribed for plaintiff. The jury concluded that those negligent acts were the direct cause of plaintiff's injuries. The jury held that plaintiff was not guilty of negligence. Finally, the jury determined that plaintiff and defendant entered an employment contract

in November 1961 and that this contract was in existence July 12, 1963. The jury assessed damages of $150,000, which included special damages of $3,530 as the amount expended for medical and hospital services.

At the outset it should be observed that we are presented with two actions in one. Plaintiff had the burden of proof not only to show that defendant negligently breached his contract in permitting the statute of limitations to operate against plaintiff's claim but also to establish that he had a recoverable claim for malpractice against Dr. Cranston. It is not contended that the doctor was insolvent or that a judgment against him would not be good. Gladden v. Logan, 28 App. Div. (2d) 1116, 284 N. Y. S. (2d) 920; Sitton v. Clements (6 Cir.) 385 F. (2d) 869, affirming Id. (E. D. Tenn.) 257 F. Supp. 63.

In an action against an attorney for negligence or breach of contract, the client has the burden of proving the existence of the relationship of attorney and client; the acts constituting the alleged negligence or breach of contract; that it was the proximate cause of the damage; and that but for such negligence or breach of contract the client would have been successful in the prosecution or defense of the action. Annotations, 45 A. L. R. (2d) 13, § 3, and 45 A. L. R. (2d) 22; 7 Am. Jur. (2d) Attorneys at Law, §§ 188, 190; 2 Dunnell, Dig. (3 ed.) § 674. Once it has been established that the relationship of attorney and client exists and that plaintiff has sustained damages by reason of the attorney's negligence or breach of contract, the right to recover is established. We think that the record here amply supports the finding of the jury that a contract for professional services was entered into between plaintiff and defendant. In addition to the testimony relating to the retainer agreement, there was evidence that plaintiff furnished authorizations to examine medical and hospital records and that defendant obtained photostatic copies of records from Minneapolis General Hospital. There also was evidence that from time to time plaintiff and his wife inquired of defendant as to the progress of the matter and were assured

that "it's all been taken care of." The issue as to the attorney-client relationship was one of fact which was resolved by the jury. On the basis of the record, it cannot be seriously contended that defendant was not negligent in permitting the statute of limitations to operate against plaintiff's cause of action.

■ We next consider the issue of whether the record establishes a recoverable action against the attending physician. In considering plaintiff's claim, as it bears upon the negligence of the attending physician, it should be noted that it is unnecessary for us to discuss those authorities which deal with the requisite degree of care, skill, and diligence which a physician must use in treating a patient. The alleged wrong here does not relate to a departure from an approved course of treatment or lack of medical knowledge. The wrong with which we are here concerned relates to a lack of diligence in discharging a patient from a hospital and from medical care and attention without instructions. We accordingly focus upon the events of July 10, 1961, when the attending physician discharged plaintiff as a patient without instructions for his care and treatment thereafter. We must consider the evidence as it bears upon plaintiff's physical, mental, and emotional state after recent electroshock treatments and administration of paraldehyde and other drugs.

It is important to note that between June 29, and July 10, 1961, plaintiff received a series of electroshock treatments. In the administration of this treatment, two or more electrodes are placed on the side of the patient's head, and a measured electric current is passed through the brain. This treatment, which is calculated to relieve severe depression and agitation, induces lack of consciousness. The beneficial results derived are largely empirical in nature. Dr. Cranston testified:

"* * * I am afraid to say that it's by experience with the use of this form of therapy that we learn how valuable it is, and we do not quite understand and do not know the physiology, the anatomy, the chemistry that is involved."

Dr. Cranston testified that, although he has had patients who have worked through the course of an electroshock treatment, it ordinarily takes a week or two before the patient is ready to go back to work. This is because the patient suffers from fatigue as a result of the shock, and his memory is affected. Plaintiff received a shock treatment at 7:30 in the morning of July 10, 1961, and was discharged at 7 that evening without the benefit of the physician's evaluation or instructions.

The jury could find that, in addition to being affected by the electroshock treatment, plaintiff may have been unhinged by the effect of paraldehyde, which is a fast-acting drug described as a colorless liquid with a strong taste, aromatic odor, and a burning disagreeable taste. This drug, which is taken orally, usually insures sleep within 10 or 15 minutes. About a half hour is required for it to reach maximal concentrations in the brain after oral administration. Chronic paraldehyde intoxication results in tolerance and dependence. The drug is used in the treatment of alcoholism, and in spite of its taste and odor the patient may prefer it to alcohol. A tolerance to it is acquired, and addiction is not infrequent.

The hospital chart showed that Dr. Cranston had scheduled further electroshock therapy for Wednesday, July 12, but, for reasons already explained, the patient was discharged by telephone and was taken home by his wife. It appears that, although plaintiff's wife had seen Dr. Cranston on the morning of July 10, she was not informed that the patient was to be discharged that day. When she was told by the hospital credit manager that her husband had to leave the hospital, she tried to contact Dr. Cranston but was unable to do so. A nurse from Dr. Cranston's office called her later in the afternoon and told her that she could pick up her husband at the hospital that evening. She accordingly took him from the hospital and on the way home they stopped at a drugstore to pick up the medications. She had never heard of paraldehyde and knew nothing of the properties and characteristics of that drug.

Our task of appraising the sufficiency of the evidence to support a verdict of malpractice is greatly aided by an able and thorough review contained in the trial court's memorandum accompanying the findings of fact, conclusions of law, and order for judgment. The memorandum carefully discusses the web of evidence, including medical testimony in context with what we believe is the correct applicable law. Because the memorandum does not lend itself to condensation, we quote from it at some length. After discussing the testimony in support of the jury's finding that the doctor was negligent in discharging plaintiff from Glenwood Hills Hospital, the memorandum goes on to say:

"July 10, 1961, was the final day of the plaintiff's course of four hospitalizations at Glenwood Hills Hospital in 1961 for a condition variously described by Dr. Cranston in the hospital charts as 'severe anxiety state with depression,' 'Depressed-hysterical personality—severe,' 'Psychoneurosis—(severe)— anxiety state.' Dr. Leslie Caplan had been the plaintiff's attending psychiatrist during the first two hospitalizations—March 1, 1961 through March 10, 1961, and April 13, 1961 through April 21, 1961. During the third hospitalization of May 21 [27], 1961 through June 10, 1961, the plaintiff on or about May 31 at his request and that of his wife was transferred from Dr. Caplan's care to Dr. Cranston.

"During each of the first three hospitalizations the plaintiff was given a course of treatment consisting of tranquilizers and other drugs. Midway in the fourth hospitalization Dr. Cranston prescribed electro-shock therapy. The electro-shock treatments began June 29, and continued thereafter on June 30, July 1, 3, 5, 7 and 10. The hospital chart showed that Dr. Cranston scheduled further electro-shock therapy for Wednesday, July 12.

"The jury could find from the evidence that electro-shock therapy is a radical treatment. Dr. Cranston so testified. Dr. Caplan stated that he would prefer to try other methods of treatment first and that if electro-shock is administered, the patient will be in the hospital for a month. Dr. Cranston testified that

a patient receiving electro-shock will not be able to work for one or two weeks following the course of treatment.

"The jury could further find that an electro-shock treatment does have debilitating side effects temporarily affecting the patient's memory and causing extreme fatigue.

"From this evidence the jury could properly conclude that from and after June 29, 1961, the plaintiff's condition was not progressing satisfactorily and that Dr. Cranston instituted a course of electro-shock treatments which had not been completed on July 10, 1961.

"In the opinion of Hector Zeller, a psychiatrist called by the plaintiff to testify as an expert, the plaintiff's illness required hospitalization between June 17, 1961 and July 10, 1961. He testified that in his opinion Dr. Cranston in discharging the plaintiff from Glenwood Hills Hospital in the late afternoon of July 10, 1961, did not act according to the usual and customary practices of psychiatrists in this area at the time in that the plaintiff's condition and fitness for release from hospitalization was not properly evaluated before discharging him by telephonic order. Dr. Zeller noted that on the date of discharge the hospital chart indicated that the patient was agitated and received two doses of paraldehyde including a large one one-half hour before discharge. He testified that the plaintiff should have continued as a patient at either Glenwood Hills Hospital or some other hospital and, under cross examination, that there was no indication in the chart that the plaintiff was ready for discharge from hospitalization.

"Dr. Zeller testified that in 1961 the usual and customary practice among psychiatrists practicing in Minnesota in determining whether to continue hospitalization or to discharge a patient who has been hospitalized for anxiety reaction or depression would include a staff conference to review the patient's progress in the hospital and to determine if he has made improvement to the point that he understands what he is doing. If the patient is sufficiently improved that he can care for himself,

and if he comprehends and has some insight into his condition, plans are then made for a placement and a referral of the patient. If the staff or team believes that the patient has made satisfactory recovery or improvement, he is discharged.

"It is not disputed that Dr. Cranston by telephone did order the plaintiff's discharge from Glenwood Hills Hospital in the afternoon of July 10, 1961. As late as July 9, 1961, Dr. Cranston had made no particular determination when he would discharge the plaintiff. Whether Dr. Cranston saw the plaintiff at all on July 10 is uncertain from the evidence. What is certain, however, is that the jury could find that Dr. Cranston did discharge him by telephone order and without making a personal evaluation to ascertain his fitness for discharge on the afternoon of July 10.[1]

"In his instructions the Court gave the jury the rules of law defining the duties of care required of physicians generally and the duties of care required of specialists. The Court further instructed the jury that in a field of specialization such as psychiatry in which different courses of treatment may properly and reasonably be applied, a doctor has the right to use his best judgment concerning the manner and means of treatment and the procedures he will follow. The jury was then instructed that they should determine from the evidence, first, what was the standard of skill and care followed by psychiatrists in this community in similar cases with respect to the discharge of patients from hospitalization and, second, whether Dr. Cranston's conduct complied with the standard. The jury also was told that the plaintiff had the burden of proof with respect to both issues.

"After reviewing his notes and the exhibits, the Court concludes that the jury could find from the evidence that a psychiatrist practicing in this community in 1961 would not telephonically discharge from hospitalization a patient suffering from an acute anxiety state marked by depression and undergoing a

---

" [1] The evidence shows that July 10, 1961 was the final day of hospitalization insurance coverage for the plaintiff."

course of treatment involving the administration of drugs, barbiturates, and tranquilizers as well as electro-shock therapy, who on the morning of the date of discharge had undergone electro-shock therapy and was sufficiently agitated thereafter during the day to be given two doses of paraldehyde, without first evaluating that patient to ascertain his condition and fitness for discharge.

"Upon the evidence the jury could further find that on July 10, 1961 the plaintiff was a patient in Glenwood Hills Hospital suffering from an acute anxiety state marked by a depression syndrome; that Dr. Cranston had prescribed and he had received over the twenty-three day course of his hospitalization substantial amounts of medications including barbiturates, sedatives, and tranquilizers; that beginning June 29 the plaintiff received seven electro-shock treatments, the last being on the morning of July 10; that subsequently during the day he was given two dosages of paraldehyde; that the discharge was not initiated by the plaintiff; that late in the afternoon of July 10, 1961, after being informed that the plaintiff's hospitalization insurance coverage was completely used, Dr. Cranston ordered his discharge by telephone without having first made an evaluation of his condition to determine the propriety of discharging him.

"Dr. Cranston testified that after having received a telephone call from someone in the hospital credit office on the afternoon of July 10 concerning the status of Christy's hospital insurance, he telephoned the discharge order. He stated that he had determined in the morning that the plaintiff was in satisfactory condition for discharge and that he made the afternoon call to determine whether that satisfactory condition continued. He testified that his decision to cancel the electro-shock treatment scheduled for Wednesday, July 12, was made independently of the call from the credit office. Dr. Cranston testified that as late as Sunday, July 9, he had made no decision to discharge the plaintiff at any particular time.

"It may well be true that in many, if not most, circumstances the telephonic discharge of a patient from hospitalization would be proper. Here, however, the test is not what is generally proper but rather what is required to meet the standard of care applicable under the particular circumstances of the case. There was evidence that would allow the jury to find that under the particular circumstances of this case a psychiatrist in the exercise of due care would have first evaluated his patient before discharging him, but that such was not done in the instant case, notwithstanding Dr. Cranston's evidence to the contrary.

"In the Court's opinion, there is in the case a sufficient foundation in the evidence for the jury's answer to the interrogatory. Accordingly, it must stand.

" 'Question 2. If your answer to the foregoing question is "Yes," was such negligence a direct cause of the plaintiff's injuries?

" 'Answer: Yes.'

"A review of the evidence satisfies the Court that the jury could find that the attending psychiatrist's negligence in discharging the plaintiff on the afternoon was a direct cause of the injuries he subsequently sustained. Notwithstanding the attending psychiatrist's Clinical Progress Note entered on the hospital chart under date of July 11, 1961, the day after discharge, to the effect that the patient's psychiatric state and physical condition were improved, there was no evidence that the psychiatrist or indeed anybody else made an evaluation of either the plaintiff's mental condition or his competence to care for himself or any adequate provision for the plaintiff's proper care after discharge. From the circumstances shown by the evidence the jury could conclude that no such evaluation or provision were [sic] made and that the disastrous events of the late evening of July 10 or early morning of July 11 followed in unbroken sequence thereafter and as a direct result of the plaintiff having been improperly discharged from hospitalization."

With reference to the standard of care observed by the attending physician, the trial court made these observations:

"\* \* \* Undoubtedly a psychiatrist who discharges from hospitalization a patient with a history of excessive use of alcohol and medications never knows when the patient may harm himself through improper use of alcohol and medications. It would seem to the Court, however, that a psychiatrist under such circumstances is obligated to take such reasonable precautions as are customarily taken by other psychiatrists in this community to obviate or minimize the patient suffering harm after discharge because he was not prepared or competent to care for himself or because suitable arrangements had not been made to provide proper continued care for him. That in substance is the reason given by Dr. Zeller for his opinion that Dr. Cranston failed to meet the standard of customary practice of psychiatrists in the area when he discharged the plaintiff by telephone order without having first evaluated his fitness for discharge.

"Here we deal not with generalizations but with specific albeit disputed evidence and the application of definite rules of law to the facts found by the jury from that evidence. It would seem to follow, therefore, that the general inability of a psychiatrist to prevent his patient from harming himself does not prevent liability from being imposed upon a fact finding that harm directly resulted from the psychiatrist's failure to exercise what reasonable care the circumstances may indicate by taking measures calculated to determine whether there was a risk of the harm occurring and to obviate or minimize the chances for its occurrence.

" 'Question 3. Was Dr. Cranston negligent with respect to the administration and supervision of the medications he prescribed for the plaintiff?

" 'Answer: Yes.'

"The jury was given the applicable general and specific rules of negligence. It was told that by 'administration and supervision

of the medications' was included the prescription of such medications, the amounts prescribed, and the precautions taken in prescribing them.

"Again the question postulates a standard by which the conduct of the attending psychiatrist can be judged and requires the jury to determine whether or not the plaintiff proved by a fair preponderance of the evidence that Dr. Cranston failed to exercise the requisite degree of care in prescribing medications for the plaintiff and giving precautions concerning their use.

"The record of the evidence abundantly shows that the plaintiff in 1961 already had a long history of taking alcohol and such medications as codeine to excess.

"All three psychiatrists who testified at the trial agreed that situations arise where a psychiatrist should appropriately warn a patient about the dangers of medications and instruct him about their proper use.

"When asked what precautions a psychiatrist ordinarily would take in discharging a patient from hospitalization and sending him home with habit-forming drugs, Dr. Caplan replied:

" 'A. Well, he ordinarily would prescribe a small amount of a dangerous drug, but that's not very much of a safeguard. The patient that is determined to misuse it can accumulate them or he can usually get drugs elsewhere, as in this case—he had other sources—or you turn the medications over to the mate, in this case the wife, and ask her to watch that he doesn't take them excessively and you keep a good record to make sure you yourself are not prescribing too many medications.

" 'Q. And warn the wife about the possibility?

" 'A. Yes.

" 'Q. Of addiction?

" 'A. Or suicide, yes. That's always a threat in the practice of psychiatry.'

"Dr. Cranston testified that there are situations in which a psychiatrist would appropriately warn and instruct a patient's wife about the management of medications. He further testified

that medications sometimes are placed in care of the wife because the patient cannot be trusted.

"Dr. Zeller gave opinion evidence that in discharging the plaintiff on July 10, 1961, in view of his condition, to his home and the care of his wife without giving his wife some information about the use of paraldehyde during hospitalization and instructions concerning its use after he went home, Dr. Cranston did not act according to the usual and customary standards followed by psychiatrists in this area at the time. When asked for the basis of his opinion, Dr. Zeller responded:

" 'In my opinion the patient's relatives should have been advised as well as the patient should have been advised that he was in need of further treatment, and that the dangers of the intake of sedatives such as paraldehyde and the other medications such as mellaril that Dr. Cranston prescribed pointed out the possible side effects as well as the dangers of an overdose.' The evidence was sufficient to permit a jury to find a standard of practice followed by psychiatrists in the area with respect to the administration and supervision of medications prescribed for a patient. From the evidence the jury could properly conclude, as they did, that in prescribing medications for a discharged psychiatric patient with a complaint and history comparable to those of the plaintiff, a psychiatrist practicing in this area at the time would (1) instruct the patient and his wife about the proper use of the medication, (2) warn them of the dangers inherent in excessive use of those medications, and (3) in the case of a patient with a history of taking alcohol and medications to excess cause the patient's wife to assume custody of the medications prescribed and control over dispensing them.

\* \* \* \* \*

"Nor is there any dispute that Dr. Cranston did not give Mrs. Christy specific instructions or warnings concerning the medications he prescribed for the plaintiff to take after discharge from Glenwood Hills Hospital, although he insists that sometime he had a discussion with her about her husband's medications. Upon

the evidence the jury could find, as they did, that Dr. Cranston had not discussed the plaintiff's medications or his proclivity to take excessive amounts of them with Mrs. Christy or instructed her to take custody of the medications and control administration of them to the plaintiff, although he realized that the plaintiff had a history of excessive use of alcohol and medications. The jury could further find on the evidence that Dr. Cranston did not give the plaintiff any warning about the dangers in taking more paraldehyde than was prescribed and that no specific instructions of any kind were given beyond those appearing on the prescription label.

"There is evidence that the plaintiff had long been aware and repeatedly warned against his own tendencies with respect to the excessive use of medications and alcohol. Indeed, the doctors at University of Minnesota Hospitals on occasion in 1960 had refused to refill codeine prescriptions for him. Moreover, the evidence would amply support a finding that Mrs. Christy was aware of her husband's dependence upon drugs and had on an occasion in January, 1960 hidden them from him. But there is no evidence that either he or she were given any warnings or instructions concerning the specific medications prescribed upon his discharge from Glenwood Hills Hospital.

"While the evidence undeniably shows a general awareness on the part of both the plaintiff and his wife about this tendency to excessive use of medicines, that awareness would not under the facts in this case relieve Dr. Cranston of his duty to give suitable warning and instructions about the particular medications he prescribed. If paraldehyde, which is a sedative, can induce deep sleep when taken in amounts larger than prescribed, the Christys should have so been warned. If under the particular circumstances there was a danger that Christy might take more of the medicine than prescribed—a possibility made manifest by his repeated requests for it recorded in the hospital chart—precautions should have been taken to obviate the possibility by

the giving of appropriate warnings and instructions to Mrs. Christy.

"It may be true that not even the best efforts of a physician will suffice to prevent harm to a patient, but the possibility of ultimate misfortune is no reason not to take such action as is reasonably calculated to obviate the danger of the patient falling in harm's way. Indeed such possibility would seem to afford incentive to take all reasonable precautions to prevent the harm from happening.

"Here the jury found from the evidence that the psychiatrist failed to exercise care with respect to the administration and supervision of the medications given to the plaintiff. The evidence was sufficient for them to determine what the proper standard care was and, further, to find that Dr. Cranston's conduct did not meet that standard of care.

"'Question 4.    If your answer to the foregoing question is "Yes," was such negligence a direct cause of the plaintiff's injuries?

"'Answer:   Yes.'

"In the Court's view the jury's answer is fairly supported by the evidence."

In discussing the claim that the evidence was circumstantial and that the inferences from it did not warrant the verdict, the trial court observed:

"Much has been written in the cases about circumstantial evidence[3] and inferences.[4] What already has been said many times over need not be repeated here, except to note causation in fact can be established by circumstantial evidence.[5] *Paine v. Gamble*

"[3] See the case noted in 7 Dun. Dig., sec. 3234 (3rd ed. 1954) as supplemented."

"[4] See the cases noted in 7 Dun. Dig., sec. 3235 (3rd ed. 1954) as supplemented."

"[5] See, Morris, *Proximate Cause in Minnesota*, 34 Minn. L. Rev. 185, 188 (1950)."

*Stores, Inc.,* 202 Minn. 462, 279 N. W. 257 (1938), and that a jury may draw reasonable inferences in a malpractice case to establish causation. *Jensen v. Linner,* 260 Minn. 22, 108 N. W. 2d 705 (1961). Obviously, circumstantial evidence creating nothing more than a suspicion is not enough. The evidence must furnish a reasonable basis for the inference upon which the finding is predicated, but when the evidence does provide such a basis, the finding cannot be set aside because another or contrary inference might have been drawn from the same facts. Such a finding can be set aside only when the inference is wholly unsupported by the evidence or when an undeniable preponderance of the evidence runs against the inference drawn. *Westling v. Holm,* 239 Minn. 191, 58 N. W. 2d 252 (1953).

"Although the jury could in the instant case properly have refused to draw the inference that the plaintiff injured himself by reason of taking an overdose of paraldehyde, the jury could with equal propriety draw the conclusion that he did take the overdose and consequently fell asleep while smoking. The latter finds reasonable support in the evidence.

"The defendant contends that this finding rests upon mere conjecture and that it rests upon nothing more than an inference upon an inference. The Court cannot agree. Unlike *DeVere v. Parten,* 222 Minn. 211, 23 N. W. 2d 584 (1946), in which the plaintiff's own evidence conclusively established that the concentration of carbon tetrachloride fumes to which she was exposed was harmless, competent unchallenged medical evidence here establishes that one ounce of paraldehyde is sufficient to induce a deep sleep. That Christy took the additional paraldehyde was an inference the jury drew upon the evidence submitted, just as they further inferred that the fire occurred by reason of his smoking a cigarette at the time he fell asleep. The jury was not required to draw either inference, but the evidence did provide a reasonable basis for each. Believing the plaintiff's evidence as they obviously did the jury found that of the two ounces of paraldehyde in the bottle one ounce was consumed during the

evening of July 10 or early morning of July 11. They could further find that one teaspoonful was given the plaintiff by his wife earlier and they then could infer that he consumed the balance of the ounce subsequently. Such an inference would seem to be something more than mere conjecture upon the evidence there.

"Nor would the inference concerning the origin of the fire seem to be simple conjecture. Christy was a heavy, indeed a compulsive, cigarette smoker. An ash tray with cigarette butts in it was found on a table near the chair in which he was found. Under the circumstances the inference that the fire started from a burning cigarette he was smoking at the time seems quite reasonable."

■ It is next contended by defendant that the verdict must be set aside because of a deficiency in expert testimony to support the claim of malpractice by the physician. We have held that because of the nature of a malpractice action qualified medical expert testimony is necessary to support the claim that the care and treatment provided did not measure up to the required medical standard. Swanson v. Chatterton, 281 Minn. 129, 160 N. W. (2d) 662. This rule is subject to the exception that expert testimony is not necessary where the nature of the alleged negligent conduct is such that inferences to be drawn from the facts are within the range of common experience of men and juries are equally as capable of drawing inferences as experts. Schulz v. Feigal, 273 Minn. 470, 142 N. W. (2d) 84; Moehlenbrock v. Parke, Davis & Co. 145 Minn. 100, 176 N. W. 169. In such a case, where the mode of treatment has been shown, the practical commonsense of the jury will enable them to determine that the injury or failure of cure is owing to unskillful or negligent treatment. Getchell v. Hill, 21 Minn. 464, 465.

■ The standard of conduct required to be observed by a physician in the treatment of a patient is expressed in Manion v. Tweedy, 257 Minn. 59, 65, 100 N. W. (2d) 124, 129, as follows:

"* * * A physician is not an insurer of a cure or a good result of his treatment or operation. He is required to possess only the skill and learning possessed by the members of his profession in good standing in his locality and to exercise that skill and learning with due care."

See, 14 Dunnell, Dig. (3 ed.) § 7488. The particular deficiency asserted by the defendant is that the psychiatrist who testified in behalf of plaintiff had acquired his experience in state institutions in Massachusetts, New Hampshire, and in the Minnesota State Hospital at Hastings, and that his experience and practice did not qualify him to testify as to usual and customary methods of care and treatment of voluntary patients in private hospitals. We find no merit in this contention. It is not necessary to belabor the point beyond observing that there is neither evidence nor authority to warrant a conclusion that the standard of care followed in a state hospital is any different from that followed in a private hospital.

■ Defendant's argument that plaintiff's expert witness was disqualified because of lack of knowledge of the standard of care in the "locality" of the attending physician's practice is without merit. The term "locality" has been accorded a broad connotation since the case of Viita v. Fleming, 132 Minn. 128, 155 N. W. 1077, L. R. A. 1916D, 644, which, as early as 1916, recognized that because of expanding means of communication and interprofessional information the geographical location of a physician's practice is no longer an essential element in determining the standard of care by which a defendant is to be judged. See, 14 Dunnell, Dig. (3 ed.) § 7488; Annotation, 85 A. L. R. (2d) 1022. The literal application of the so-called "locality rule" has been greatly weakened since then. It is common knowledge that urbanization and technological advances have significantly increased the availability of superior medical information to all practitioners. 5 Cal. Western L. Rev. 124; 14 Stanford L. Rev. 884; Pederson v. Dumouchel, 72 Wash. (2d) 73, 431 P. (2d) 973;

44 Wash. L. Rev. 505. While the "locality rule" may still have some validity, as it applies to a general practitioner, it should provide no defense to a specialist who is presumed to be acquainted with the national standards of his profession.[1] Plaintiff's task in procuring competent expert medical testimony is difficult enough, and it should not be increased by arbitrary and unrealistic limitations.

■ It is further urged that plaintiff's expert medical witness was not qualified to testify as to standards of practice in Minnesota because, at the time of trial, he was not a board-certified psychiatrist.

In considering this objection, it should be noted that Dr. Zeller received his degree in medicine in 1953 from the National University of Mexico City and was admitted to practice in Mexico. He served an internship at Juarez Hospital in Mexico City. In 1954, he took a rotating internship at Newton-Wellesley Hospital, which is a general hospital in the greater Boston area. Then for two years he had a residency in psychiatry at Medfield State Hospital in Massachusetts. In 1957, he transferred for his third year of residency to New Hampshire State Hospital, Concord, New Hampshire. Throughout his residency, he had charge of patients and participated in the admission and discharge of psychiatric patients. While at the New Hampshire institution, he advanced to the rank of senior physician as well as director and coordinator in 1959. In that capacity he supervised six other physicians. In May 1960, he joined the staff of the Hastings State Hospital with the rank of chief of service. He was appointed medical director of the institution in January 1964 after

---

[1] "* * * Thus negligence, in reference to psychiatric medical practice, is that conduct which deviates from the nationally recognized professional standards which should be adhered to and complied with by those in the specialized field of psychiatry in the diagnosis or treatment of a patient's mental illness through psychiatric examination, analysis and therapy." Morse, *The Tort Liability of the Psychiatrist,* 16 Buffalo L. Rev. 649, 652.

becoming licensed in 1963 to practice in Minnesota. From the time he was first on the Hastings State Hospital staff, Dr. Zeller participated in decisions admitting and discharging patients, involving both voluntary as well as involuntary patients. He also administered medications including paraldehyde. After starting at Hastings State Hospital, he began to have contacts with other psychiatrists in the Twin City area and, in 1960 and 1961, participated with them in decisions as to whether or not to discharge patients from hospitalization.

There is nothing in the record which indicates that defendant offered evidence to show that the usual and customary standards of practice followed by psychiatrists in this area differed from those described by Dr. Zeller. The trial court took the view, consistent with Berkholz v. Benepe, 153 Minn. 335, 190 N. W. 800, that a graduate of a reputable medical school may testify as an expert in a malpractice case notwithstanding that he was not licensed to practice in Minnesota at the time the alleged malpractice occurred. The fact that Dr. Zeller was not authorized to practice in Minnesota in 1961 did not render him incompetent to testify as an expert inasmuch as an unlicensed doctor is not rendered incompetent to testify by statute. Moreover, opinion evidence is not restricted to the testimony of the person best qualified to give an opinion or even to some of the few persons best qualified. One may be competent to testify as an expert although he is not shown to be highly qualified to speak upon the subject or is not at the top of his profession. It is usually held that any person whose profession or vocation deals with the subject at hand is entitled to be heard as an expert, while the value of his evidence is to be tested by cross-examination and ultimately determined by the jury. 31 Am. Jur. (2d) Expert and Opinion Evidence, § 30.

■ Without further reviewing the standards of practice and care expressed by plaintiff's expert witness and reviewed in the trial court's memorandum already quoted, it is sufficient to state that it is the duty of a physician or surgeon, in dealing with a

case, to give the patient or his family or attendants all necessary and proper instructions as to the care and attention to be given to the patient and the cautions to be observed, and a failure to give such instructions is negligence which will render him liable for resulting injury. Vann v. Harden, 187 Va. 555, 47 S. E. (2d) 314; Barnes v. Bovenmyer, 255 Iowa 220, 122 N. W. (2d) 312; Steele v. Woods (Mo.) 327 S. W. (2d) 187; Norton v. Argonaut Ins. Co. (La. App.) 144 So. (2d) 249; 70 C. J. S., Physicians and Surgeons, § 48h; Annotation, 57 A. L. R. (2d) 379, 411. The trial court's analysis of the evidence amply establishes the breach of this duty.

■ Defendant alleges that prejudicial error occurred when the trial court permitted plaintiff's expert, Dr. Zeller, to answer a hypothetical question which assumed that plaintiff was "habituated" or "addicted" to paraldehyde. Defendant also complains that Dr. Zeller was requested to assume that, "[a]t no time prior to or during that evening did Dr. Cranston or any other doctor tell Mrs. Christy that Mr. Christy was addicted or habituated to any drugs or drug, or, specifically, to paraldehyde" and "[a]t no time prior to or during that evening did Mrs. Christy know that Mr. Christy was addicted or habituated to any drugs or drug, or, specifically, paraldehyde."

In considering these objections, it should be noted that a hypothetical question which remains in the range of the issues and the evidence and includes only such facts as are supported by the evidence or which the evidence tends to prove is not objectionable. A proponent of the question is not confined to the positive and direct testimony; rational inferences as well as positive and direct testimony may form the basis for the question. A question may be framed on any theory which can be reasonably deduced from the evidence, and the proponent may select as a predicate therefor such facts as the evidence proves or reasonably tends to establish or justify. An appellate court will not interfere with the exercise of the trial court's discretion with reference to the form and content of such a question unless such discretion has

been abused or wrongfully exercised. 31 Am. Jur. (2d) Expert and Opinion Evidence, §§ 54 to 57; 7 Dunnell, Dig. (3 ed.) § 3337; Grapentin v. Harvey, 262 Minn. 222, 114 N. W. (2d) 578.

On the basis of the record, we cannot say that the trial court abused its discretion. Drs. Caplan, Cranston, and Zeller and Dr. Abraham Falk all testified to the habit-forming propensities of paraldehyde. Plaintiff's hospital chart disclosed numerous administrations of the drug, at times upon direct order of the doctor and at other times upon plaintiff's request. In addition, the nurses' notes of June 27, 1961, stated, "Watches time closely for when his paraldehyde is due." Again, on June 29, 1961, the nurses' notes stated, "Requesting paraldehyde, when told it was too early according to his chart seemed upset, felt he really needed med. * * * Seeking additional medication." Furthermore, Dr. Cranston himself, on June 24, 1961, by an order which permitted plaintiff to leave the hospital for an afternoon directed the nurses to send medication with his wife but cautioned, "Do not send paraldehyde with." Since the basis of statements contained in the question was derived from inferences and facts, although they may be disputed, it cannot be said that the form and content of the statement was fatal to its admissibility.

■ Defendant complains that in his argument to the jury on the issue of pain and suffering plaintiff's attorney suggested damages on a "per diem" basis. Courts have expressed varying views as to the propriety of this approach as an aid to estimating the award for pain and suffering. This approach is not found objectionable where it is coupled with an instruction that the argument is not to be substituted for evidence and that the jury should follow the court's general instructions regarding that element of damage. Ahlstrom v. Minneapolis, St. P. & S. S. M. R. Co. 244 Minn. 1, 68 N. W. (2d) 873; Flaherty v. Minneapolis & St. L. Ry. Co. 251 Minn. 345, 87 N. W. (2d) 633; Annotation, 60 A. L. R. (2d) 1347, § 3. We have held that "the use of the mathematical formula is proper for purely illustrative purposes." Flaherty v. Minneapolis & St. L. Ry. Co. 251 Minn. 345, 348, 87

N. W. (2d) 633, 635; Boutang v. Twin City Motor Bus Co. 248 Minn. 240, 80 N. W. (2d) 30.

The views of the trial court on this point are expressed in the following interesting and well-reasoned statement:

"Thus, the law recognizes that considerable latitude must be given counsel in the discharge of his professional obligations in trial upon the presumption that he is familiar with and will abide by the traditions of his profession and the oath he took when admitted to practice. For like reasons broad discretionary powers are given the trial judge to regulate and control the trial proceedings. Generally, however, the judge should wield those powers with restraint and should not interfere in the trial except to prevent unfairness or bias.

"So, too, in the instant case, cool reason and logic did not prevail at all times during the course of the trial on either side. More than once both lawyers had recourse to emotion arousing means of persuasion. Each on occasion raised his voice above that volume reasonably necessary to make himself clearly heard in the courtroom. In short, each of the lawyers acted very much in character and as a forceful advocate. After carefully reviewing his notes on the trial proceedings, the Court cannot say that either lawyer by his conduct prejudiced the proceedings or created an atmosphere tainted with bias or prejudice or poisoned by unfairness.

"If the defendant in complaining of the asserted misconduct of plaintiff's counsel transgressing the outer boundary of propriety had specific instances occurring during trial in mind, he should have enumerated them. He did not do so, and the Court can find none.

"There remains to consider, however, final argument. At the close of counsel for the plaintiff's final argument, the defendant's lawyer at considerable length stated into the record numerous objections to it. Accordingly, the Court has carefully reviewed Mr. Burns' summation.

"The general principle according counsel considerable latitude to press his client's cause vigorously and forcefully limited only by considerations affecting the basic fairness and integrity of the proceedings are equally applicable to final summation. For the reasons already suggested definite rules limiting the scope of legitimate argument cannot be stated with precision. There are too many variables from case to case.[12] Perhaps one of the best general canons of argument was written by Justice Matson in *Hardy v. Anderson,* 241 Minn. 478, 483-484, 63 N. W. 2d 814 (1954):

" '* * * In arguing to the jury it is elementary that counsel is entitled to present his client's case forcefully and fairly, and his efforts are not to be crippled by compelling him to run a course of technical hazards either when he draws factual inferences from the conflicting evidence or when he applies the law to the facts as he, as an advocate, sees them. Although he may not strike foul blows, he may strike hard blows which are not always technically correct. *Except in extreme cases errors and omissions of counsel in discussing the applicable law or in the drawing of factual inferences are cured when the jurors are expressly instructed*—as they were here—that they are the exclusive judges of the facts and that their recollection of the facts must prevail over any contrary contentions of counsel and *that they must take and apply the law as given by the court and not as presented by counsel.'* (Emphasis supplied.) This statement seems apt in the case under consideration.

"Granting a new trial because of improper argument by counsel rests almost wholly within the discretion of the trial court. *Connolly v. The Nicollet Hotel,* 258 Minn. 405, 104 N. W. 2d 721

---

"[12]There are, of course, a number of specific practices in final argument which the Supreme Court has expressly disapproved. For example, directing remarks directly to a person in interest rather than to the jury, as was done in the instant case by defendant's counsel, has been condemned. See Brabeck v. Chicago & Northwestern Ry. Co., 264 Minn. 160, 117 N. W. 2d 921 (1962)."

(1960). The seriousness of the instant case gives added emphasis to the importance of scrutinizing the proceedings carefully to determine that the trial in all its aspects was a fair one to the parties and that the integrity of the proceedings was in no way vitiated by sympathy, prejudice, or bias. To that end the Court directed that a transcript of Mr. Burns' summation be made. That has been done and the transcript reviewed.

"After reading that transcript and considering it in balance with the evidence adduced at the trial the Court cannot say that the argument transgressed the bounds of professional propriety or was so extreme in content and form that the verdict must be set aside because the trial became unfair or because it could not do otherwise than improperly prejudice the minds of the jury."

■ We next consider defendant's claim that the verdict is excessive, not commensurate with the damages sustained, and should be reduced. The question of excessiveness of a verdict is generally one for the determination of the trial court in the first instance, and we have generally held that its action in granting or refusing to grant a new trial on that ground will not be disturbed on appeal unless abuse of direction is shown. Anderson v. Pittsburgh Coal Co. 108 Minn. 455, 122 N. W. 794; Larsen v. Minneapolis Gas Co. 282 Minn. 135, 163 N. W. (2d) 755. See, 22 Am. Jur. (2d) Damages, §§ 366, 367.

In sustaining the verdict, the trial court noted the extent of plaintiff's injuries, including second- and third-degree burns over 30 percent of his body—predominantly on the right side— "and that the burned areas included the right shoulder both anteriorly and posteriorly, the right elbow circumferentially to such a degree that the bones and cartilage were exposed, the right hip and lateral thigh, and the right pretibial and dorsal foot areas." The court also pointed out that the jury could consider that "ten surgical procedures were performed on the plaintiff after admission to debride the burned areas and apply split thickness skin grafts." The trial court also noted that there was

a permanent impairment of the right elbow, leaving the joint fixed "in a position of approximately 80 degrees flexion and normal supination." On the basis of these injuries, plaintiff's counsel, in closing argument, asked for a verdict representing "a sum of money which constitutes full, fair, reasonable compensation for all the pain and the suffering and the humiliation and embarrassment." No remuneration for loss of wages or damage to future earning capacity was sought. In point of fact, the record discloses that plaintiff's injuries caused him to miss work from July 1961 until March 1962, at which time he resumed his regular employment selling automobiles, an occupation at which he has been engaged since about 1947. There was no contention that his injuries affected his subsequent employment in any manner or impaired his earning capacity. At the time of the trial, he was employed as general sales manager for an automobile agency.

After reviewing the record as well as the authorities, we are persuaded that the record does not sustain a verdict in the amount returned by the jury. At the time of trial, plaintiff was 44 years of age, had a remaining life expectancy of 29.34 years, and sustained no impairment of earning capacity. Making due allowance for the pain and suffering sustained by plaintiff, the nature of which admittedly was exceedingly severe, the consensus of this court is that the verdict substantially exceeds any rational appraisal or estimate of the total damages actually sustained. While there is little profit in speculating as to what prompted the jury to return a verdict of this size, in which pain and suffering represented the substantial element of damage, this court is left with the feeling that the excessive award might be explained by a measure of passion and prejudice which arose from the strange circumstances of this case. It is not unlikely that the verdict expresses an accumulated resentment the jury might naturally have felt, not only because of defendant's neglect but also from the offhand medical treatment plaintiff received at the hands of others who are not defendants in this case.

174

It is the judgment of this court that the verdict should be reduced to the sum of $100,000 general damages, to which should be added special damages in the amount of $3,530, which represents hospital and medical services. In the event this reduction is not accepted by plaintiff by the filing of his consent in writing with this court within 10 days, a new trial is ordered on the issue of damages alone.

■ Defendant next contends that the amount of the verdict should be reduced by the amount plaintiff would have had to pay defendant attorney had he successfully prosecuted the claim. If we understand this point correctly, it postulates an error on the part of the trial court in not informing the jury that they should deduct from the verdict the amount of attorneys' fees plaintiff would have had to pay defendant had he lived up to his obligations. In support of this point, defendant relies on Sitton v. Clements (6 Cir.) 385 F. (2d) 869; McGlone v. Lacey (D. S. D.) 288 F. Supp. 662; Childs v. Comstock, 69 App. Div. 160, 74 N. Y. S. 643, as well as other authorities, none of which are apposite or require discussion beyond the observation that the record would indicate that, in the trial of this case, the parties probably proceeded upon the assumption that the element of attorneys' fees, which plaintiff might have had to pay defendant had he successfully prosecuted the suit, was canceled out by the attorneys' fees plaintiff incurred in retaining counsel to establish that defendant failed to prosecute a recoverable action. The theory now asserted is an afterthought and presents an entirely new issue which was never considered at trial nor submitted to the jury and with respect to which no instructions were requested. If defendant felt that there was some basis for diminished damages, he should have asserted that theory in the court below. Hollerman v. F. H. Peavey & Co. 269 Minn. 221, 130 N. W. (2d) 534; 5 Am. Jur. (2d) Appeal and Error, § 640; 1B Dunnell, Dig. (3 ed.) § 407; 5B Dunnell, Dig. (3 ed.) § 2533; 22 Am. Jur., Damages, § 297; Lanesboro Produce & Hatchery Co. v. Forthun, 218 Minn. 377, 16 N. W. (2d) 326.

The opinion filed herein on January 23, 1970, is withdrawn and the foregoing is substituted in its place.

Affirmed on condition plaintiff consents to reduction. No costs are allowed to either party.

ROGOSHESKE, JUSTICE (dissenting).

Although I agree that the verdict is excessive, I believe the better procedure in a case such as this, where the trial court found an evidentiary foundation for the award and has not directly passed upon a specific request for a reduction, is to remand with directions to the trial court to determine the amount of the remittitur, as I previously have urged in Auger v. Rofshus, 267 Minn. 87, 94, 125 N. W. (2d) 159, 164. Cf. Soltis v. Geary, 287 Minn. 19, 176 N. W. (2d) 633.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.

MR. JUSTICE KELLY, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.