No. 02-365

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 111

BABCOCK PLACE LIMITED PARTNERSHIP,
a Montana Limited Partnership,

       Plaintiff and Appellant,

  v.

BERG, LILLY, ANDRIOLO & TOLLEFSEN, P.C.,
n/k/a BERG, LILLY & TOLLEFSEN, P.C.; INDIVIDUAL
JOHN DOES 1 THROUGH 20; JOHN DOE PARTNERSHIPS
A THROUGH Z; and JOHN DOE PROFESSIONAL
CORPORATIONS OR OTHER ENTITIES AA TO ZZ,

       Defendants and Respondents.

APPEAL FROM:    District Court of the Fourteenth Judicial District,
                In and for the County of Musselshell, Cause No. DV 00-07,
                The Honorable Randal I. Spaulding, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

           Mark D. Parker, Casey Heitz, Parker Law Firm, Billings, Montana

       For Respondents:

           Margy Bonner, Steven J. Harman, Brown Law Firm, P.C., Billings, Montana

                        Submitted on Briefs:  January 23, 2003

                               Decided:  April 25, 2003

Filed:

_____
                Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1     The Plaintiff, Babcock Place Limited Partnership ("Babcock"), filed a complaint in the District Court for the Fourteenth Judicial District in Musselshell County, in which it alleged that the Defendant Berg, Lilly, Andriolo & Tollefsen, P.C., ("the firm") was professionally negligent and damaged the Plaintiff.  Both parties moved for summary judgment.  The District Court awarded summary judgment to the defendant and dismissed the action.  Babcock appeals the District Court's order granting summary judgment.  We reverse the District Court's order and remand for further proceedings.

¶2     The issue on appeal is whether the District Court erred when it granted the law firm's motion for summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

¶3     Babcock is a partnership established for the purpose of developing and selling real estate in Bozeman, Montana.  In 1993, Babcock purchased real estate along West Babcock Street in Bozeman on which to develop a residential subdivision that would be known as "Babcock Meadows."  In the spring of 1993, Anson Crutcher, a limited partner of Babcock, contacted Sue Haggerty, the owner of an approximate four-acre parcel of property along West Babcock Street that was "not necessary but desirable" for the development of Babcock Meadows and offered to purchase her property.  An important issue in their negotiations was Haggerty's desire to keep one acre of her property and her home after the parcel was added to the Babcock Meadows subdivision.

2

¶4 Crutcher and Haggerty reached a preliminary agreement on the terms of a purchase agreement, and Crutcher contacted Mike Lilly, a partner at the Berg firm, to draft the agreements for the purchase. In an August 5, 1993, letter to Lilly and Bruce Combs, a recent law school graduate who was not yet admitted to practice law in Montana, Crutcher provided the general terms for the proposed purchase. Crutcher informed Lilly and Combs that he needed "iron-clad" terms because Haggerty was "a perfect example of 'give an inch, take a mile,'" and that while the property was desirable, "[t]ime is of the essence." He stated that if Haggerty would not agree to terms by the end of August, Babcock would abandon plans to purchase the Haggerty parcel and resume their initial subdivision plan.

¶5 Lilly assigned Combs to draft an initial purchase agreement with the terms supplied by Crutcher, and Combs used legal descriptions supplied by Morrison-Maierle, an engineering firm hired by Babcock to help plan and develop Babcock Meadows. However, after Combs drafted the agreement, Lilly substantially revised it because he saw potential problems with the method of property transfer.

¶6 In the revised agreement, Haggerty agreed to convey the entire four-acre parcel to Babcock and retain an irrevocable option to purchase a parcel of property amounting to, by its description, "1.0 Ac. more or less." In exchange, Babcock agreed to pay $5,000 in earnest money and two promissory notes in the amounts of $55,000 and $140,000 which were secured by a trust indenture on the property. The agreement provided that Empire Federal Savings and Loan would serve as the escrow agent. Haggerty and an agent of Babcock signed the purchase agreement on September 30, 1993.

¶7 Several years later, on June 28, 1997, Babcock filed an application with the City of Bozeman to amend the plat for "Phase 1" of the Babcock Meadows subdivision, which now included the Haggerty property. Since Haggerty retained a trust indenture on a portion of the property, her signature was necessary for approval of the amendment. However, when presented with the plan for the property, Haggerty realized that the proposed acreage for her parcel would be .88 acres, which she concluded was inconsistent with the "1.0 Ac. more or less" printed in the property description in the purchase agreement. The deviation apparently resulted from an error made by Morrison-Maierle while drafting the proposed property boundaries. Haggerty refused to sign the application. Babcock altered the plat to increase the acreage to .96 acres, but again, Haggerty refused to sign the application.

¶8 Babcock then sought to buy out Haggerty's interest in the property and made a payment on the outstanding balance in the escrow account to Empire and requested that Empire transfer to it a Deed of Reconveyance, so that Babcock could submit the plat application without Haggerty's signature. However, Haggerty was informed of the planned payment and when told that she objected to any such payments, Empire refused to accept Babcock's payment or release the Deed of Reconveyance.

¶9 Babcock filed a complaint against Haggerty and Empire in the District Court for the Eighteenth Judicial District in Gallatin County, to compel Haggerty's signature on the application. In late 2000, the District Court ordered that Haggerty sign the application and that Babcock pay Haggerty the difference in value between the "1.0 acres" listed in the purchase agreement and the .96 acres she actually received.

4

¶10 During that litigation, on February 25, 2000, Babcock filed this claim against the Berg firm, alleging that it had been professionally negligent when handling the transaction between Babcock and Haggerty and that its negligence caused several years of delay and expense to secure Haggerty's signature on the application to amend the Babcock Meadows plat. The firm counterclaimed for unpaid legal fees.

¶11 During the course of discovery, Babcock disclosed its expert witness, James Murphy, a Montana attorney, who provided a preliminary and supplemental disclosure of his opinion that the firm had failed to meet the requisite standard of care for attorneys in similar land transactions. In particular, Murphy opined that, with knowledge of Babcock's need for expediency and accuracy in the drafting of the purchase agreement with Haggerty, Berg violated the standard of care when it: (1) had Combs, a non-attorney with no contract-drafting experience, draft the initial agreement and obtain an inaccurate legal description of the Haggerty property from Morrison-Maierle; (2) used "more or less" to cure defects in the property description when the included legal description of the Haggerty property was clearly deficient; (3) failed to include a provision that would require Haggerty to sign future applications for a final plat; and (4) failed to execute proper escrow documents that would prevent Haggerty from having "veto power over any proposed developments" and would transfer "complete control and power over the land" by escrow as soon as the escrow account balance was paid. With respect to the fourth area, the escrow agreement, the disclosure provided:

> In a normal real estate situation such as this, escrow agreements are established with deeds and other documents placed therein so that as soon as

5

the money is paid, then complete control and power over the land by the purchaser is transferred by way of escrow (usually a deed) so that the benefits of ownership to the buyer without the necessity of further litigation or complications.

¶12 On January 11, 2002, the firm moved for summary judgment. Babcock later filed its own motion for summary judgment. In its defense against summary judgment, Babcock provided the affidavit of Murphy, that restated his opinion regarding the firm's breach of the standard of care. With respect to escrow agreements, he declared that:

> "The use of an escrow agent would not have resolved the conflict between Haggerty and Babcock Place." Defendants argue that the use of an escrow agent would [not] have resolved the conflict. Of course, the Defendants are wrong.
>
> As the Court is fully aware, in any real estate action, one party is usually giving up money and the other party is giving up land. Neither party wants to give up their consideration without insuring the other party receives the benefit of that consideration. In this case, we clearly have a situation where Babcock gave up all of its money but never received in exchange the land which could have been subdivided pursuant to the Subdivision and Platting Act.

¶13 The District Court heard oral argument on the summary judgment motions and on April 29, 2002, issued its memorandum and order denying Babcock's motion for summary judgment and granting Berg's motion for summary judgment. The District Court entered final judgment on May 30, 2002, dismissing Babcock's complaint with prejudice, and ordering Babcock to pay certain costs incurred by Berg. Babcock appeals the District Court's order granting summary judgment.

## STANDARD OF REVIEW

¶14 We review a district court's decision to award summary judgment *de novo*. *Spinler v. Allen*, 1999 MT 160, ¶ 14, 295 Mont 139, ¶ 14, 983 P.2d 348, ¶ 14. We apply the same criteria a district court applies when it considers a motion for summary judgment, which is set forth in Rule 56(c), M.R.Civ.P.:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

¶15 The party moving for summary judgment has the initial burden of proving that there are no genuine issues of material fact that would permit a non-moving party to succeed on the merits of the case. *Spinler*, ¶ 15; *Montana Metal Buildings, Inc. v. Shapiro* (1997), 283 Mont. 471, 474, 942 P.2d 694, 696. If the moving party meets this burden, then the non-moving party must provide substantial evidence that raises a genuine issue of material fact, to avoid summary judgment in favor of the moving party. *Spinler*, ¶ 15; *Montana Metal*, 283 Mont. at 474, 942 P.2d at 696. "Material issues of fact are identified by looking to the substantive law which governs the claim." *McGinnis v. Hand*, 1999 MT 9, ¶ 6, 293 Mont. 72, ¶ 6, 972 P.2d 1126, ¶ 6 (quoted in *Spinler*, ¶ 15).

## DISCUSSION

¶16 Did the District Court err when it granted the law firm's motion for summary judgment?

¶17 The District Court considered the firm's motion for summary judgment by analyzing each of Murphy's allegations of negligence and applying the legal malpractice standards set

7

forth by this Court in *Lorash v. Epstein* (1989), 236 Mont. 21, 24, 767 P.2d 1335, 1337. After doing so, it concluded that there were no issues of material fact and that, as a matter of law, the firm did not commit professional negligence. The District Court concluded that, as a matter of law, there was nothing wrong with having Combs, a supervised non-attorney, draft a preliminary agreement and noted that Babcock did not allege that Combs was negligently supervised by Lilly. The District Court concluded that § 28-10-601, MCA, precluded Babcock from succeeding on its claim that the firm was negligent for using the expression "more or less" in the legal description of the property when the legal description was actually provided by Morrison-Maierle, an agent of Babcock. Addressing the third allegation, the District Court concluded that Babcock could not meet the "but for" requirement set forth in *Lorash* because Haggerty's affidavit and prior deposition testimony demonstrated that she would not have signed an application for an amended plat "under any circumstances." Therefore, it held that any contractual provision requiring her signature would have been of no benefit. Finally, the District Court concluded that the testimony established that there was already an escrow agent involved in the transaction, and that the escrow agent was not able to resolve the underlying dispute and still meet its fiduciary duties to Haggerty.

¶18     Babcock contends that the District Court erred because, among other bases for liability, the affidavit of its expert created issues of material fact as to whether a provision requiring Haggerty's signature and a proper escrow agreement would have avoided the delay and litigation that resulted from the Haggerty property transaction, and whether reasonable

8

care would have recognized the defective property description. Babcock contends that the testimony of Haggerty that she would not have signed a plat application "under any circumstances" is evidence that had the agreement been properly drafted, Haggerty would have, at the least, refused to sign the purchase agreement at all and Babcock could have avoided the Haggerty transaction and the resulting delay to the Babcock Meadows plat application.

¶19 The firm contends that the District Court properly dismissed the claims for the reasons stated in its order and that there are no remaining issues of material fact to decide.

¶20 What constitutes "material issues of fact" in an action for professional liability of an attorney is discussed in *Lorash v. Epstein* (1989), 236 Mont. 21, 767 P.2d 1335, where we held that:

> In pursuing a negligence or breach of contract action against an attorney, the plaintiff must initially establish the existence of an attorney-client relationship. The plaintiff must then establish that the acts constituting the negligence or breach of contract occurred, proximately causing damages to the plaintiff. The final requirement for the plaintiff is the need to establish "[t]hat 'but for' such negligence or breach of contract the client would have been successful in the prosecution or defense of the action."

*Lorash*, 236 Mont. at 24, 767 P.2d at 1337 (quoting *Christy v. Saliterman* (Minn. 1970), 179 N.W.2d 288, 293-94); *see also Fang v. Bock*, 2001 MT 116, ¶¶ 15-17, 305 Mont. 322, ¶¶ 15-17, 28 P.3d 456, ¶¶ 15-17. We note however, that our decision in *Lorash* occurred prior to our decision in *Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 916 P.2d 122, which distinguished the differences between "proximate cause" and "cause-in-fact" or the "but for" test (as stated in *Lorash*). We held:

> In those cases which do not involve issues of intervening cause, proof of causation is satisfied by proof that a party's conduct was a cause-in-fact of the damage alleged . . . a party's conduct is a cause-in-fact of an event if "the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it."

*Busta*, 276 Mont. at 371, 916 P.2d at 139 (quoting *Prosser and Keeton on Torts* § 41, at 266 (5th ed. 1984)).

¶21 We conclude that Babcock has sufficiently established that there was an attorney-client relationship between Babcock and the Berg firm and proceed to the second part of the *Lorash* test, which requires that Babcock establish that the firm was negligent. *Lorash*, 236 Mont. at 24, 767 P.2d at 1337. In *Carlson v. Morton* (1987), 229 Mont. 234, 238, 745 P.2d 1133, 1136, we held that in order to maintain a professional negligence action, "the plaintiff must prove that the professional owed him a duty [and] that the professional failed to live up to that duty, thus causing damages to the plaintiff." To establish the standard of duty required for an attorney, we have held that, with limited exceptions, "only expert testimony can establish the standard of care in a legal malpractice case." *Moore v. Does 1 to 25* (1995), 271 Mont. 162, 165, 895 P.2d 209, 210 (citing *Carlson*, 229 Mont. at 240-41, 745 P.2d at 1137-38).

¶22 Babcock provided an expert who declared by affidavit that Berg failed to meet the requisite standard of care for attorneys drafting contracts when it failed to obtain an accurate legal description of the property, failed to include a written provision requiring Haggerty's signature on future applications for amended plats, and failed to require in the escrow agreement that, when the outstanding balance was paid, "complete control and power over

10

the land" transferred to Babcock without the need for Haggerty's signature. While the firm has submitted expert opinion evidence to refute Murphy's opinion, we conclude that the conflicting evidence merely raises a material issue of fact, regarding the proper standard of care, which must be resolved by a trier-of-fact.

¶23 Finally, we must consider whether there is evidence that the firm's alleged negligence was the "cause-in-fact" of Babcock's injuries. The firm contends that there were three facts which preclude a finding that its conduct was the "cause-in-fact" of Babcock's injuries: (1) Babcock's agent provided the erroneous legal description of the Haggerty property that led to Babcock's eventual injuries; (2) Haggerty's refusal to sign the application "under any circumstances;" and (3) the escrow agent's adherence to its fiduciary duties to Haggerty required that it refuse to transfer the Deed of Reconveyance where the parties disputed the acreage that was the subject of their contract.

¶24 With respect to the erroneous legal description, we conclude that there is a remaining issue of material fact as to whether the firm's independent failure to recognize a problem with the legal description contributed as a cause of Babcock's damages. Murphy's affidavit states:

> The standard of care requires an attorney practicing real estate law in Montana to recognize that the description delivered by the engineer could never be a tract which Mrs. Haggerty could receive - by option or otherwise. The failure of Combs caused confusion and delay. She did not understand what "acre" she would receive. Combs did not understand it either, but he had the obligation to his client to avoid misunderstanding on the part of Mrs. Haggerty, not create it.

11

It is alleged by Babcock and supported by Murphy, that an attorney exercising the requisite standard of care would have noticed that the description of the Haggerty property was inadequate and requested clarification or refused to draft the purchase agreements. It is alleged that this recognition would have occurred in spite of any misinformation provided by the engineer. Therefore, we conclude that there is an issue of material fact regarding the merits of the claim that the firm was negligent for failing to recognize the incorrect legal description.

¶25 With respect to a provision requiring Haggerty's future signature on plat applications, we agree with the firm that there is nothing in the record to suggest that its failure to include such a provision was a "cause-in-fact" of Babcock's injuries. Nothing in the record suggests that Haggerty's obstinate refusal to sign any plat documents "under any circumstances" due to the proposed acreage apportioned to her would have been changed by an express requirement for her signature, nor that the subsequent delay to pursue litigation would have been shortened. Rule 56(e), M.R.Civ.P., requires that "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings." Accordingly, we conclude that the firm is entitled to partial summary judgment on this issue.

¶26 Finally, with respect to the escrow agreement, we note that the District Court stated:

> It is immaterial whether an escrow was established to hold the titled documents as the history of the transaction with Haggerty showed that she would object to the release of any documents from the escrow agent so long as the acreage she was to receive was disputed . . . . As is common in the real estate industry, and as evidenced by the actions of Empire, an escrow agent will not typically place itself into the middle of a dispute between the parties to the escrow agreement, each of whom the escrow agent owes a fiduciary duty. The contention of Babcock's expert, that some type of escrow would

12

have prevented the dispute has no basis. Perhaps when he gave his opinion in this regard, he was not aware that an escrow had been established and that such an escrow was not effective to resolve the dispute between Haggerty and Babcock. In any event, it is apparent that Empire, as escrow agent, was not going to release any escrowed documents without the full agreement of all affected parties.

In essence, the District Court concluded that Babcock could not prove that the language of the purchase and/or escrow agreement was the "cause-in-fact" of Babcock's damages because regardless of the language used, an escrow agent would not have released the documents without the agreement of the parties or later court order.

¶27    Therefore, we must consider the obligations of the escrow agent in this transaction. It is without dispute that escrow agents "occup[y] a fiduciary responsibility to the parties to [an] escrow transaction." *Brandt v. Sande*, 2000 MT 98, ¶ 28, 299 Mont. 256, ¶ 28, 1 P.3d 929, ¶ 28 (citations omitted). However, we have held that "the duty of an escrow agent is narrowly defined by law. An agent is bound to comply only with the instructions of the parties to the escrow agreement and may not exceed this authority." *Brandt*, ¶ 28 (citation omitted). In addition, we have held that an escrow agent "fulfilled a legal, fiduciary duty by strictly following the instructions of the principals to [an] escrow account." *Brandt*, ¶ 29.

¶28    In *Turbiville v. Hansen* (1988), 233 Mont. 487, 761 P.2d 389, we considered an escrow agreement created for a similar purpose. In *Turbiville*, parties entered into a contract for deed and placed the documents in escrow. The escrow agreement included an instruction that if the buyer defaulted on the contract for deed, the seller "upon demand shall be entitled to the immediate return from the escrow agent of the contract for deed, warranty deeds and abstracts, so that they may pursue such remedies as provided by law for the foreclosure of

13

the contract for deed." *Turbiville*, 233 Mont. at 490, 761 P.2d at 392. The buyer allegedly

defaulted, and the seller demanded that the escrow agent return the escrow documents. The

escrow agent returned the documents without giving any notice to the buyer. *Turbiville*, 233

Mont. at 489, 761 P.2d at 391. In the buyer's suit against the seller and escrow agent, we

held:

> [T]he only obligation of the escrow holder was to adhere strictly to the
> instructions as provided in the escrow agreement. The [escrow agent's] duty,
> under paragraph 4 of the escrow agreement, was to "upon demand"
> immediately return the escrow documents to the sellers in the event of default.
> The agreement does not require the escrow agent to ascertain whether the
> demand for return of the escrow documents is technically justified. Neither
> does it require the escrow agent to determine whether the notice was legally
> sufficient . . . or whether the contract and default notice are void for
> vagueness. . . . These determinations are appropriate for a court of law, not
> for the escrow agent. The remedy for omission of any of these requirements
> was suit against the [sellers] . . . These issues do not create an issue of material
> fact as to the claim against the [escrow agent], because they are unrelated to
> whether the [escrow agent] adhered strictly to the instructions as provided in
> the escrow agreement.

*Turbiville*, 233 Mont. at 491, 761 P.2d at 392 (citation omitted).

¶29    Applying our decision in *Turbiville*, we conclude that the District Court's analysis

regarding escrow agents was incorrect and that the agent's fiduciary duties to the parties are

as provided by the written instructions and agreement.

¶30    Furthermore, we conclude that Babcock offered sufficient proof that if the language

of the escrow agreement was negligently drafted, it was a "cause-in-fact" of Babcock's

damages. The language that Murphy contends should have been included in the agreement

would have given Babcock "complete power and control" over Haggerty's property after

paying the purchase price. The Deed of Reconveyance would have eliminated the need for

14

Haggerty's signature on the application to amend the plat, and, therefore, have eliminated the delay that Babcock contends caused him damage.

¶31 In summary, we conclude that there is an issue of material fact as to whether the firm followed the requisite standard of care when it drafted the escrow agreement for the purchase of the Haggerty property, and whether the purported terms of the escrow agreement satisfied the requisite standard of care. This issue, in addition to the issue of whether the law firm violated the standard of care when it adopted the legal descriptions provided by Morrison-Maierle, are issues to be determined by the trier-of-fact.

¶32 For the foregoing reasons, we reverse the judgment of the District Court and remand for further proceedings consistent with this Opinion.


/S/ TERRY N. TRIEWEILER


We Concur:

/S/ KARLA M. GRAY



/S/ JIM REGNIER

/S/ JEFFREY H. LANGTON
District Judge Jeffrey H. Langton
sitting for Justice W. William Leaphart

Justice Patricia O. Cotter dissenting.

¶33 I would affirm the judgment of the District Court and dissent from our refusal to do so.

¶34 First, I disagree that there is an issue of material fact as to whether the Firm's independent failure to recognize a problem with the legal description (the property being described as "1.0 acres more or less") contributed as a cause of Babcock's damages, as the Court finds at ¶ 24. As the Court points out, Babcock hired the engineering Firm of Morrison-Maierle, to help plan and develop Babcock Meadows. It was Morrison-Maierle, Babcock's agent, and not the Firm, that devised the legal description of "1.0 acres more or less." The Firm did nothing more than place on paper the legal description given to it by Babcock's agent. Moreover, the Court neglects to point out that while the legal description of the property was "1.0 acre more or less," there was also a metes and bounds description of the one-acre tract in question. Thus, its boundaries were easily ascertainable.

¶35 However, I find a larger problem with the Court's analysis of this case in general. The essence of this case is that Babcock made a poor decision in the first place by giving Haggerty the option to buy back one acre, and now wants to blame the Firm for it. Babcock admits as much in its briefs on appeal, stating: "Babcock never wanted to sell Haggerty her own house. Babcock only wanted to buy three acres. . . Babcock wanted to be a buyer but instead ended up warranting one acre to Haggerty [sic] which it never had an interest because of Lilly's [the Firm's] mistake." It further argues that ". . . had the Berg Law Firm put together the precise agreement that the parties bargained for. . . then the parties would have

16

known in 1993 whether they had a meeting of the minds." Babcock thus argues on appeal that the acquisition of that last acre, which became the ultimate stumbling block in the transaction, was accomplished because of the Firm's mistake. I have a significant problem with Babcock's logic.

¶36     As the Court points out at ¶ 3, Babcock is a partnership established for the purpose of developing and selling real estate in Bozeman, Montana.  It found Haggerty's property "not necessary but desirable" for the development of Babcock Meadows.  As the Court goes on to state, an important issue in the negotiations between Haggerty and Babcock was Haggerty's desire to keep one acre of her property and her home after her parcel was added to the Babcock Meadows Subdivision.  Thus, it is clear that Babcock was well aware of Haggerty's desire to retain her one acre of property before it hired the Berg Firm to draft the purchase agreements.  Babcock even advised the Firm that Haggerty might be difficult to deal with.  Given Babcock's sophistication as a real estate developer, its knowledge of the requisites of the residential subdivision it wished to develop, and its understanding of the difficulties that dealings with Haggerty might present, one would think that Babcock would scrutinize the purchase agreement drafted by the Berg Firm with these concerns paramount in its mind.   But for whatever reason, Babcock signed the revised purchase agreement, which specifically obligated it to purchase the entire four-acre parcel from Haggerty, while allowing Haggerty to retain an irrevocable option to purchase a parcel of that property amounting to 1.0 acres, more or less.

¶37    There is no allegation that the buy-sell agreement was so difficult to comprehend that Babcock did not know what it was signing.  This being so, I would conclude that Babcock is in no position to now sue its own law firm for malpractice for the way it drafted an agreement which Babcock, being a sophisticated buyer of real estate, evidently understood and still signed.  *If Babcock wanted three acres and no option all along, as it argues on appeal, it should have declined to sign the document as drafted.*

¶38    It is a well-established maxim of law that "acquiescence in error takes away the right of objecting to it."  Section 1-3-207, MCA.  In *Goodman Realty, Inc. v. Monson* (1994), 267 Mont. 228, 883 P.2d 121, this Court held that "a person who is not acting under mistake or fraud and who acquiesces in an error loses his right to object to the error." (citing *Schillinger v. Huber* (1958), 133 Mont. 80, 320 P.2d 346).  While *Goodman* and *Schillinger* are factually distinct from the case before us[1], such distinction does not minimize the application of the rule.  Babcock knew the terms and conditions it wanted in the purchase agreement. It nonetheless signed a purchase agreement that did not contain those terms and conditions. Having done so, it should now be estopped from pointing the finger of blame at someone else.

¶39    For the reasons expressed above, I also disagree with the Court's conclusion that there is an issue of material fact as to whether the Firm followed the requisite standard of care when it drafted the escrow agreement for the purchase of the Haggerty property.   First of

---

[1]    In both cases, this rule was applied to a dispute between contracting parties wherein one party knew of an error in the details of the contract but chose to sign it anyway.

all, the escrow instructions are not in the record the parties have provided to this Court, so it is impossible to determine whether the instructions were poorly or well-drafted. The record also fails to reflect who drafted the instructions. Often, escrow agents supply their own form sets of escrow instructions. However, even if we presume that it was the Firm that drafted the instructions, the fact remains that the problems started with Babcock's execution of the purchase agreement. It was that document that spawned the problems between Babcock and Haggerty. The escrow instructions did nothing more than implement its terms.

¶40 I think we have made this case far too complicated. Because it foresaw problems with Haggerty, Babcock should have read what it signed to ensure that the document accomplished its wishes. Instead, Babcock signed the instrument of its own demise. I would not place the blame for the ensuing problems at anyone's feet but Babcock's. I would therefore affirm the order of summary judgment, and dissent from our refusal to do so.

/S/ PATRICIA COTTER

Justices James C. Nelson and Jim Rice join in the foregoing dissent.

/S/ JAMES C. NELSON

/S/ JIM RICE