AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Appellant

v.

NATIONAL DEVELOPMENT AND RESEARCH CORPORATION and Robert E. Tang, Appellees.

No. 05–06–01024–CV.

Court of Appeals of Texas, Dallas.

Aug. 29, 2007.

Jeffrey S. Levinger, Christopher John Scanlan and Thomas Fenton Allen, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, Corbet F. Bryant, Richardson, TX, for Appellant.

David W. Shuford, Shuford & Associates, Dallas, TX, for Appellee.

Before Justices WRIGHT, RICHTER, and SMITH.[1]

## OPINION

Opinion by Justice SMITH.

This is an appeal from a jury verdict in a legal malpractice lawsuit filed by appellees National Development and Research Corporation and Robert E. Tang [2] (collectively NDR) against appellant Akin, Gump, Strauss, Hauer & Feld, L.L.P. The jury found Akin Gump negligent and assessed damages totaling $922,631.86. Akin Gump does not appeal the finding of negligence but seeks to reduce the damages awarded, arguing that (1) NDR did not prove that certain damages would be collectible; (2) no evidence supports the jury's finding of fair market value of the Pan–Sino stock at issue; (3) attorney's fees in the underlying lawsuit are not a proper measure of damages in a malpractice suit; and (4) an offset is due for the 10% contingency fee NDR would have owed Akin Gump for prevailing in the underlying lawsuit. We conclude attorney's fees are not recoverable in this malpractice suit, but resolve all other issues in favor of the judgment.

### BACKGROUND

In October 1997, NDR retained Akin Gump to represent it in disputes with Panda Energy Corporation and its affiliates. These disputes arose from a 1994 Letter Agreement in which NDR agreed to assist Panda Energy Corporation in its efforts to develop and operate power plants in China. As part of the Letter Agreement, Panda Energy Corporation agreed to pay NDR an annual service retainer, a success fee, and stock grants in a contemplated subsidiary. Later that year, Panda Ener-

---

1. The Honorable Bea Ann Smith, Justice, Court of Appeals, Third District of Texas at Austin, Retired, sitting by assignment.

2. Tang and his wife are the only shareholders of NDR.

gy Corporation formed Pan–Sino Energy Development Company, L.L.C. (Pan–Sino), to act as a holding company for its Chinese projects. Panda Energy Corporation and NDR executed a Shareholders' Agreement which gave NDR a 4.5% stock interest in Pan–Sino and required Panda Energy Corporation to repurchase NDR's stock in Pan–Sino upon termination of the Letter Agreement.

In 1995, with NDR's approval, Panda Energy Corporation assigned the Letter Agreement to Panda Energy International. Two years later, again with NDR's approval, Panda Energy Corporation sold its stock in Pan–Sino to Panda Global Energy Company. According to the Letter Agreement, Panda Energy International remained obligated to repurchase the Pan–Sino stock from NDR upon termination of the Letter Agreement.[3] Meanwhile, the Panda entities developed a power plant in Luannan County in the Tangshan Municipality of Hebei Province in the People's Republic of China (the Luannan project). Pan–Sino held approximately 87% interest in the Luannan project.

For reasons not relevant here, Panda Global Energy notified NDR that it was terminating the Letter Agreement and exercising its right under the Shareholders' Agreement to repurchase NDR's 4.5% interest in Pan–Sino. The parties disagreed about the validity of the termination, which

Panda entity should repurchase the stock, and the stock's value.

Panda Global Energy filed a declaratory judgment action against NDR to resolve the parties' disputes. NDR filed third-party claims against Panda Energy International and Pan–Sino. Akin Gump represented NDR in all matters. The case was tried to a jury. The jury returned a verdict partially in favor of NDR and partially in favor of the Panda entities. However, the trial court granted the Panda entities' motion for judgment notwithstanding the verdict because NDR failed to submit jury questions to support the verdict in their favor.[4] The trial court then entered final judgment in favor of the Panda entities and ordered NDR to pay $111,043.50 in attorney's fees to Panda Global Energy for prevailing in the declaratory judgment action, and $347,348 in attorney's fees to Panda Global Energy and Pan–Sino pursuant to the Shareholders' Agreement. NDR appealed. This Court affirmed,[5] and the Texas Supreme Court denied review.

After exhausting all appeals in the Panda litigation, NDR sued Akin Gump for legal malpractice for failure to submit jury questions to support the verdict in the Panda lawsuit. The jury found Akin Gump negligent and awarded NDR $922,631.86 for the following damages: (1) $168,667.41 for "the judgment paid by NDR in the Panda lawsuit"; (2) $427,777.77 as the fair market value of the

---

3. Additionally, the trial court issued an order in the underlying lawsuit specifically finding that Panda Energy International was not released from its obligations under the Letter Agreement or Shareholders' Agreement by virtue of its delegation or assignment to Panda Global Energy Company. The parties do not appear to dispute that Panda Energy International was obligated to repurchase the Pan–Sino stock from NDR.

4. Although the jury found that NDR did not breach its agreements with, or violate its fidu-

ciary duties to, the Panda entities, NDR did not submit jury questions asking whether the Panda entities failed to comply with the provisions of the Letter Agreement or the Shareholders' Agreement and whether NDR was damaged by any failure to comply. *See Nat'l Dev. & Research Corp. v. Panda Global Energy Co.*, No. 05–00–00820–CV, 2002 WL 1060483 (Tex.App.-Dallas May 29, 2002, pet. denied) (not designated for publication).

5. *Id.*

Pan–Sino stock subject to the repurchase agreement; (3) $216,590 in attorney's fees and expenses paid by NDR in the Panda lawsuit; (4) $109,596.68 in success fees owed to NDR by Panda. The trial court denied Akin Gump's request for an offset in the amount of a 10% contingency fee it would have earned for prevailing in the Panda lawsuit.

On appeal, Akin Gump does not appeal the finding of negligence or the award of $168,667.41 for the judgment NDR paid the Panda entities in the underlying suit. It brings four issues challenging all the other elements of damages and insisting on its entitlement to an offset.

### FAIR MARKET VALUE OF PAN-SINO STOCK

In its second issue, Akin Gump insists the evidence is legally insufficient to support the jury's award of $427,777.77 for the fair market value of the Pan–Sino stock Panda Energy International was obligated to repurchase from NDR. Its argument is two-fold: (1) NDR offered incompetent and thus no evidence of the fair market value of the Pan–Sino stock it owned at the time of the breach; and (2) NDR offered no evidence of the fair market value of the stock remaining in its possession today. It is Akin Gump's position that any value of the stock still held by NDR today must be deducted from the value of that stock at the time of the breach to properly calculate that measure of damages.

■ In evaluating the legal sufficiency of the evidence to support a jury finding, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d

788, 793 (Tex.2006) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005)). We will sustain a no-evidence point when the evidence offered to establish a vital fact does not exceed a scintilla. *Id.* (citing *City of Keller*, 168 S.W.3d at 810). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004)).

■ When we review a challenge to the legal sufficiency of an expert's testimony, our task is not to determine whether the expert's opinion is correct. *Kerr–McGee Corp. v. Helton*, 133 S.W.3d 245, 257 (Tex.2004). Instead, we are to determine whether the expert's conclusions are reliable. *Id.; see Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712–13 (Tex.1997). In doing so, we examine the principles, research, and methodology underlying the expert's conclusions. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex.2006) (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002)).

### Fair Market Value at Time of Breach

■ Generally, the measure of damages for breach of a contract to repurchase stock is the difference between the contract price and the fair market value of the stock at the time of the breach. *See Miga v. Jensen*, 96 S.W.3d 207, 215 (Tex.2002) (quoting *Randon v. Barton*, 4 Tex. 289 (1849)); *Coleman v. Mayes*, 347 S.W.2d 827, 830 (Tex.Civ.App.-Houston [1st Dist.] 1961, writ ref'd n.r.e.). In this case, the jury charge did not define "fair market value." Although Akin Gump tendered a definition of fair market value comporting with the parties' Letter Agreement,[6] the trial court overruled its objection to the charge and denied the request; Akin

---

6. The Letter Agreement stated that the fair market value of the stock would be deter-

mined by the board of directors of Panda Energy Corporation if the stock was not pub-

Gump does not appeal those rulings. As a result, we analyze the sufficiency of the evidence based on the ordinary meaning of "fair market value."

Generally, the fair market value of closed corporation stock, or stock having no public market, as here, is "what a willing purchaser would pay to a willing seller who was not acting under compulsion to sell." *Willis v. Donnelly*, 118 S.W.3d 10, 40–41 (Tex.App.-Houston [14th Dist.] 2003), *aff'd in part and rev'd in part on other grounds*, 199 S.W.3d 262, 279 (Tex. 2006); *InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 889 (Tex.App.-Texarkana 1987), *disapproved on other grounds by Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240 (Tex.2002). When stock sales do not exist upon which fair market value may be determined, other methods of assessing fair market value include the asset approach and the earnings, or income, approach. *See Willis*, 118 S.W.3d at 41.

### NDR's expert Jonathan Saiger

NDR presented the preliminary report and deposition testimony of Jonathan Saiger, vice president at PricewaterhouseCoopers, concerning the fair market value at the time of the breach of the Pan–Sino stock NDR owned. Saiger originally prepared this report, dated June 21, 1999, for Akin Gump on behalf of NDR in the underlying Panda lawsuit. His report provides "a preliminary estimate of the fair market value of NDR's shares in Pan–Sino constituting a 4.5% equity ownership interest as of June 30, 1997, assuming that NDR's shares are on a controlling and marketable basis." In his deposition, Saiger explained that he used the discounted cash flow, or income, approach to value the stock because no comparable sales or historical data were available to use the market and asset approaches. He stated the income approach "involves projecting future benefits from a project or company and then discounting those benefits to the present time using a rate that reflects their expected risk."

Saiger analyzed the value of the Pan–Sino stock NDR owns under six different scenarios.[7] For each scenario, Saiger relied on income projections contained in the

---

licly traded at the time of the termination. The Shareholders' Agreement provided that, upon termination of the Letter Agreement, the fair market value of the stock "will be the Appraised Value as of the date of the termination of the Letter Agreement." The Shareholders' Agreement defined "Appraised Value" in part as "the fair market value per share that would be received with respect to the [Pan–Sino] Shares to be transferred as if the sale were a sale of all the [Pan–Sino] shares in a single transaction to an independent third party...."

7. The six scenarios are:
 • The Luannan facility operates for twenty years, beginning in August 1999. Value of NDR's shares as of June 30, 1997 under scenario one is $3,839,000;
 • The Luannan facility operates for twenty years, beginning in August 1999, and 100% of Pan–Sino's equity is funded by a share-holder loan from Panda Global Energy, with repayment from distributions to Pan–Sino over 10 years at an interest rate of 13.94% per annum. Value of NDR's shares as of June 30, 1997 under scenario two is $2,401,000;
 • The Luannan facility operates for thirty years, beginning in August 1999. Value of NDR's shares as of June 30, 1997 under scenario three is $3,941,000;
 • The Luannan facility operates for thirty years, beginning in August 1999, and 100% of Pan–Sino's equity is funded by a share-holder loan from Panda Global Energy, with repayment from distributions to Pan–Sino over 10 years at an interest rate of 13.94% per annum. Value of NDR's shares as of June 30, 1997 under scenario four is $2,503,000;
 • The Luannan facility undergoes a 100 megawatt expansion that begins operation in January 2004 and the entire facility oper-

Panda Global Energy April 1997 bond offering prepared by the securities firm of Donaldson, Lufkin & Jenrette for the Luannan project. Saiger testified he did not undertake a detailed analysis or investigation of all of the underlying documents supporting the financial projections contained in the offering memorandum, but he did review them for "some level of reasonableness" and looked at the factors that were used to determine whether they were consistent with the industry.

Akin Gump contends that each of Saiger's six scenarios is based on at least one faulty assumption, and, as a result, is incompetent and constitutes no evidence of the fair market value of the Pan–Sino stock.[8] Akin Gump asserts two arguments against all six scenarios: (1) Saiger erroneously assumed that all of the cash flow from the Luannan project would be distributable to Pan–Sino at the end of the year in which it was generated; and (2) the ability of the Luannan project to charge the 7.4 cents per kilowatt hour tariff contained in the offering memorandum and upon which Saiger relied in his calculations was being questioned as early as May 1999.

### Cash Flow Distribution

Akin Gump does not complain that the income projections contained in the offering memorandum, which Saiger used in making his calculations, are unreliable.

Nor does Akin Gump complain that the income approach Saiger used is an unacceptable method for determining fair market value. Instead, Akin Gump complains about Saiger's methodology in using the net cash flow figures contained in the offering memorandum to calculate the value of the stock. The firm specifically complains that Saiger assumed a distribution of the entire net cash flow, when the undisputed evidence showed that Chinese regulations require a portion of the cash flow, called the "undistributable cash flow," to remain in China and thus unavailable to Pan–Sino, a non-Chinese company. But Akin Gump's own expert agreed that the existence of the undistributable cash flow would bear on the valuation of the Pan–Sino stock because the Shareholders' Agreement requires the stock to be appraised as if the sale were a sale of all of the company's shares in a single transaction to an independent third party, and an independent third party would take the undistributable cash flow figure into account in valuing the company. Saiger explained that he assumed all of the cash flow would be distributed each year because "[t]his assumption is necessary and reasonable considering the fact that NDR is assumed to have a controlling interest in Pan–Sino. . . ." Although Akin Gump's expert testified he would have calculated the cash flow distribution differently, this does

---

ates until July 2029. Value of NDR's shares as of June 30, 1997 under scenario five is $6,314,000;

• The Luannan facility undergoes a 100 megawatt expansion that begins operation in January 2004 and the entire facility operates until July 2029, and 100% of Pan–Sino's equity is funded by a shareholder loan from Panda Global Energy, with repayment from distributions to Pan–Sino over 10 years at an interest rate of 13.94% per annum. Value of NDR's shares as of June 30, 1997 under scenario six is $4,333,000.

8. Akin Gump does not challenge Saiger's qualifications to render an opinion of the value of the stock. Indeed, Saiger was the expert Akin Gump sponsored on behalf of NDR in the underlying lawsuit. Saiger's report was not used in the underlying lawsuit because he was not timely designated as an expert. We find it unconvincing that Akin Gump complains about the opinion of an expert it sponsored in the underlying lawsuit. But NDR did not raise this complaint below, nor does it urge it on appeal, other than in response to the sufficiency issue.

not make Saiger's calculations unreliable. *See Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 500–01 (Tex.2001); *Nip v. Checkpoint Sys., Inc.,* 154 S.W.3d 767, 772 (Tex.App.-Houston [14th Dist.] 2004, no pet); *United Servs. Auto. Ass'n v. Pigott,* 154 S.W.3d 625, 631 (Tex.App.-San Antonio 2003, judgm't withdrawn by agr.).

■ Akin Gump further contends that Saiger miscalculated NDR's interest in the Pan–Sino stock because he counted the undistributable cash flow twice. We have reviewed Saiger's calculations and agree that he mistakenly counted the undistributable cash flow twice. However, we do not agree that this makes Saiger's opinion unreliable. As we stated earlier, Akin Gump does not complain that the income projections contained in the offering memorandum are themselves unreliable. An error in addition or multiplication goes to the weight to be given the expert's opinion on valuation; it does not challenge the reliability of the underlying data. *See Wilkins,* 47 S.W.3d at 500–01; *Pigott,* 154 S.W.3d at 631–32.

### Tariff to be Charged

■ We next consider Akin Gump's contention that Saiger's opinion is unreliable because he used the tariff from the 1997 offering memorandum of 7.4 cents per kilowatt hour. Akin Gump contends that tariff is unreliable for two reasons. First, as early as May 1999, it was questionable whether the Luannan project would be able to charge this tariff. And second, the actual price charged in 2001 was approximately 5 cents per kilowatt hour, 40% less than the tariff in the offering memorandum.

To support its first contention, Akin Gump introduced a May 14, 1999 *Global Power Report* article entitled "Moody's Lowers Rating on Panda's 100–MW Project in Luannan, China." That article forecast lower-than-expected revenues for the Luannan project based, in part, on lower-than-projected tariff charges due to an oversupply of electricity in the area. Akin Gump argues this information was available to Saiger and he failed to consider it. But Saiger relied on the assumption made by an independent third party in the offering memorandum prepared two months before the article was published. And Akin Gump's own expert testified that the parties' agreements upon which the tariff was determined did not change based on the *Global Power Report* article. Whether Akin Gump's expert would have considered possible price changes does not impact the reliability of Saiger's calculations, which were based on an independent report from a third party. *See Nip,* 154 S.W.3d at 772; *Wilkins,* 47 S.W.3d at 500–01; *Pigott,* 154 S.W.3d at 631–32. We conclude a single article questioning whether the Luannan project would be able to charge the contracted-for price does not affect the reliability of the underlying data prepared by an independent third party upon which Saiger relied. And we fail to see how the actual tariff charged in 2001 could have had any impact on Saiger's analysis, which he prepared two years earlier in 1999.

■ Akin Gump further challenges three of Saiger's scenarios (one, three, and five) because they assume the equity contribution to the Luannan project does not have to be repaid. Akin Gump contends this directly contradicts the terms of the offering memorandum. Even if these three scenarios are unreliable, that does not affect Saiger's opinions in the remaining three scenarios.

Akin Gump challenges the valuations contained in four of Saiger's scenarios because Saiger assumes (1) in scenarios three and four, that the Luannan project will operate and generate cash for thirty

years, instead of the contracted-for twenty-year term; and (2) in scenarios five and six, that the Luannan project will undergo an expansion in 2004 and will produce cash flow until 2029. Akin Gump contends there is no evidence to support either assumption. We disagree. Tang testified agreements were in place to extend the twenty-year term by ten years and to expand the project in 2004. This testimony constitutes some evidence to support Saiger's assumptions.

Even if we disregard Saiger's opinions in scenarios one, three, and five, we conclude the evidence contained in scenarios two, four, and six exceeds a scintilla to support Saiger's opinions concerning the valuation of NDR's Pan–Sino stock at the time of the breach.

### Tang's Testimony

█ Tang testified that he formed NDR, a consulting company, in the late 1980s. As owner of NDR, Tang testified he performs consulting services in corporate finance and serves as interim chief financial officer for the companies that engage him. The chief financial officer of Panda Energy Corporation hired NDR to help locate projects in China where Panda Energy Corporation could build and develop electric power generation facilities. As part of the agreement, Panda Energy Corporation also hired Tang as business adviser "to the chairman of Panda."

Tang testified that the Letter Agreement stated the fair market value of the Pan–Sino stock would be determined by an independent appraiser and "will be the appraised value as of the date of the termination of the Letter [A]greement." He read the definition of "appraised value" contained in the Letter Agreement, and then explained to the jury that "appraised value" meant "that whenever you try to put a value on the ownership of the China project, treat it as if the entire company is

being sold in a single transaction to a[n] independent third party. That means it's like a going public in an IPO or in a merger acquisition you sell your whole company to a buyer, to a willing buyer, a willing seller." Tang also explained that this method of calculating the stock's value was important to him, because if one buyer was buying the entire company, the stock would have a higher value than in a sale of a small portion of the stock.

Tang testified he worked with Saiger as the expert was preparing his report and opinions of value in the underlying Panda litigation. Tang's own calculations about the value of the Pan–Sino stock were provided to assist Saiger. Tang explained the methods of evaluating the stock that Saiger used in his report. Tang then testified that, based on his personal knowledge and review of all relevant documents, his opinion was that the value of NDR's Pan–Sino shares at the time of the breach was between $6,314,000 and $7,718,107.

█ Akin Gump cites to testimony where Tang admitted: he was not an expert in valuation and not qualified to do any formal appraisal of businesses; he had not reviewed Pan–Sino's balance sheets; the offering memorandum said Pan–Sino was projected to lose hundreds of thousands of dollars the first three years; and the existence of $155.2 million in senior secured notes to which any stock in Pan–Sino was subordinated. It is well-settled in Texas that a property owner may testify about the market value of his property if his testimony shows he is familiar with the market value and his opinion is based on that market value. *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex.1996); *Porras v. Craig*, 675 S.W.2d 503, 503 (Tex. 1984). We have applied this general rule to allow a part owner of a business to testify about the market value of that business's stock. *Vector Indus., Inc. v. Dupre*,

793 S.W.2d 97, 103 (Tex.App.-Dallas 1990, no writ). It was not necessary for Tang to qualify as an expert witness to testify about his opinion of his own personal property. Although Tang did not use the words "market value," we conclude from his lengthy testimony concerning the valuation of the stock that his testimony was based on market value. Accordingly, we conclude Tang's testimony is some evidence of the fair market value of the Pan–Sino stock at the time of the breach.

### Other evidence of value

■■■ NDR offered evidence, without objection, that Panda Energy International valued NDR's interest in the Pan–Sino stock at $350,000. Additionally, Akin Gump's expert testified that the fair market value of NDR's interest in the Pan–Sino stock was between $100,000 and a negative $100,000. And other evidence showed that the underwriter for the financing of the Luannan project valued NDR's ownership interest in the project at between $6 million and $8.2 million.

The legally sufficient evidence shows the value of the Pan–Sino stock NDR owned at the time of the breach was between $8.2 million and a negative $100,000. The value placed on the stock by the jury was well within the wide range of values reflected in the evidence. Clearly, the jury highly discounted Saiger's and Tang's values, perhaps taking into account the $350,000 value stated by Panda and the $100,000 or less value stated by Akin Gump's expert. We conclude the evidence supporting the jury's determination of the fair market value of the Pan–Sino stock owed to NDR by Panda exceeds a scintilla.

### Deduction for Current Value

Akin Gump further contends that NDR was required to account for the current value of the Pan–Sino stock it still owns and, because it did not do so, the evidence is legally insufficient to support this damages award.

■■■ NDR insists Akin Gump waived its argument concerning the current value of the stock by failing to object to the jury charge. Akin Gump responds that it preserved this no-evidence issue by raising it in its post-judgment motions. We agree that Akin Gump preserved the no-evidence issue. *See Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 620–21 (Tex.App.-Dallas 2005, no pet.) (no-evidence point preserved for review if appellant raised issue in post-judgment motion). Because Akin Gump did not request that the jury be instructed to deduct the current value of the stock and did not object to the omission of such an instruction, we consider the evidence in light of the charge given. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 232 (Tex. 2005); *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex.2001). We are not authorized to evaluate the sufficiency of the evidence under calculations different from those the jury was instructed to use. *Nip*, 154 S.W.3d at 774. And because the jury in this case was not given any instructions about the calculations to use, all evidence of the stock's "fair market value," however calculated, is relevant to our inquiry. *See Dupre*, 793 S.W.2d at 103–04 (because issue referred generally to "value," without specific reference to "market value," "book value," or some other measure of "value," all testimony as to value relevant).

We have previously concluded the evidence supporting the jury's determination of the fair market value of the Pan–Sino stock exceeds a scintilla. Because the jury was asked only to determine the fair market value, without any reduction for the current value of the stock, and Akin Gump did not object to the jury charge on this

ground, we must conclude that the evidence of the stock's value, as that issue was submitted to the jury without objection, is legally sufficient.

We overrule Akin Gump's second issue.

## COLLECTIBILITY OF JUDGMENT

In its first issue, Akin Gump asks us to reverse the damages awarded for the fair market value of the Pan–Sino stock and the success fee because NDR did not prove it would have successfully collected such a judgment even if it had prevailed in the Panda lawsuit. The charge defined "Panda" to include Panda Global Energy and Panda Energy International. The parties do not dispute that Panda Global Energy is insolvent. Akin Gump contends NDR offered no evidence that Panda Energy International is solvent. We disagree.

We review this issue under the same no-evidence standards enunciated earlier. *See Suberu,* 216 S.W.3d at 793; *City of Keller,* 168 S.W.3d at 827. To show a judgment in the Panda lawsuit would have been collectible, NDR was required to introduce evidence that Panda Energy International was solvent "on the date the case was filed or anytime thereafter." *Jackson v. Urban, Coolidge, Pennington & Scott,* 516 S.W.2d 948, 949 (Tex. Civ.App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.); *see also Schlosser v. Tropoli,* 609 S.W.2d 255, 257 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ ref'd n.r.e.) (personal knowledge of whether company had sufficient assets to satisfy judgment sufficient to show judgment collectible).

Here, the Panda lawsuit was filed in 1997, and the judgment signed in October 2000. NDR introduced the business records affidavit of the general counsel and chief legal officer of Panda Energy International and twenty-one pages of Panda Energy International's business records. These records contained a consolidated financial statement showing that the four joint ventures that own the Luannan project had over $108 million in assets and over $47 million in owners' equity in May 2001, only seven months after the judgment in the Panda lawsuit was signed.

Additionally, the jury determined NDR's approximately 5% interest in the Pan–Sino stock was valued at over $400,000, making the remaining 95% interest worth over $8 million. And Tang testified that "Panda" owned over 88% of the Luannan project.

We conclude this evidence is sufficient to create more than a mere surmise or suspicion that Panda Energy International was solvent during the relevant time period and had sufficient assets to pay a $537,-374.45 [9] judgment on the date the lawsuit was filed or anytime thereafter.

We overrule Akin Gump's first issue.

## ATTORNEY'S FEES

The jury awarded as damages $216,590 for "[a]ttorney's fees and expenses paid by NDR in the *Panda Lawsuit.*" In its third issue, Akin Gump argues there is no evidence to support this award because NDR did not plead, prove, or obtain a jury finding to support a fee forfeiture, and, in any event, the remedy of fee forfeiture should be determined by the court, not by a jury. At trial, Akin Gump objected to the submission of the attorney's fees issue on the grounds that whether a party is entitled to recover attorney's fees is a question of law

---

9. This is the sum of the fair market value of NDR's Pan–Sino stock at the time of the breach and the success fee awarded by the jury. Akin Gump does not challenge the collectibility of $168,667.41 awarded for the judgment NDR had to pay the Panda entities in the underlying lawsuit.

for the court and that disgorgement of fees is not a remedy available in a negligence action.

NDR has made it clear in its brief and at oral argument that it is not seeking to recover as damages the attorney's fees it expended at trial, but only the appellate attorney's fees it incurred to appeal its loss at trial, only to lose again.[10] NDR asserts that it would not have incurred the fees and expenses of an appeal but for Akin Gump's negligence. We reject this proposition, noting that even a successful litigant may be forced to defend its judgment when the losing party appeals. Indeed, we decline to make any distinction between attorney's fees incurred at trial and on appeal in discussing the propriety of awarding those fees as damages in a subsequent malpractice suit.

■ Whether the attorney's fees and expenses incurred in prior litigation with a third party may serve as a measure of damages in a subsequent lawsuit is a subject of wide debate among the intermediate appellate courts of this state. *See, e.g., El Dorado Motors, Inc. v. Koch,* 168 S.W.3d 360, 366 (Tex.App.-Dallas 2005, no pet.) (declining to award attorney's fees in legal malpractice suit because attorney's fees expended in prior litigation recoverable only when provided for by contract or by agreement between parties); *Martin–Simon v. Womack,* 68 S.W.3d 793, 797–98 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Cupples Coiled Pipe, Inc. v. Esco Supply Co.,* 591 S.W.2d 615, 619 (Tex.Civ. App.-El Paso 1979, writ ref'd n.r.e.); *Dalton S.S. Corp. v. W.R. Zanes & Co.,* 354 S.W.2d 621, 624 (Tex.Civ.App.-Fort Worth

1962, no writ). *But see Hoover v. Larkin,* 196 S.W.3d 227, 231–32 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (to extent client seeks attorney's fees as actual damages, lack of causation evidence defeats claim); *Lesikar v. Rappeport,* 33 S.W.3d 282, 306 (Tex.App.-Texarkana 2000, pet. denied) (op. on reh'g) (recognizing split in intermediate appellate courts and concluding plaintiff may recover attorney's fees as damages where defendant's wrongful conduct forces plaintiff to prosecute or defend litigation in another proceeding); *Standard Fire Ins. Co. v. Stephenson,* 963 S.W.2d 81, 90 (Tex.App.-Beaumont 1997, no pet.) (same); *Judwin Props., Inc. v. Griggs & Harrison,* 911 S.W.2d 498, 507 (Tex.App.-Hous. [1st Dist.] 1995, no writ) (stating that "recovery of fees paid to an attorney may be appropriate when his or her negligence rendered the services of no value"); *Baja Energy, Inc. v. Ball,* 669 S.W.2d 836, 838 (Tex.App.-Eastland 1984, no writ) (recognizing equitable exception to general rule that attorney's fees not recoverable as damages). *Cf. Interstate Contracting Corp. v. City of Dallas,* No. 3:98–CV–2913–M, 2001 U.S. Dist. LEXIS 777 (N.D.Tex. Jan. 26, 2001) (mem. op. and order) (recognizing conflict among Texas intermediate appellate courts and concluding that attorney's fees not recoverable as damages); James M. Stanton, *Recovering Attorney's Fees in Equity Under Texas Law: Why Some Texas Courts of Appeal Have it Wrong,* 29 T. MARSHALL L.REV. 243, 249–83 (2004) (discussing conflict among Texas intermediate appellate courts).

**10.** Akin Gump argues the record contains no evidence that NDR actually paid these appellate fees to Akin Gump. But Akin Gump raises this issue for the first time in its reply brief and, as a result, we do not consider it. *See 2218 Bryan Street, Ltd. v. City of Dallas,* 175 S.W.3d 58, 65 (Tex.App.-Dallas 2005, pet. denied) (rules of appellate procedure do not allow appellant to include in reply brief new issue in response to matter raised in appellee's brief but not raised in appellant's original brief) (citing *Howell v. Tex. Workers' Comp. Comm'n,* 143 S.W.3d 416, 439 (Tex. App.-Austin 2004, pet. denied)).

Some courts have reasoned that attorney's fees should be counted in calculating damages because the claimant was required to prosecute or defend litigation as a consequence of the wrongful act of the defendant. *See Baja,* 669 S.W.2d at 839. Notwithstanding the widening debate, this Court has consistently concluded that attorney's fees are not recoverable as damages for legal malpractice. *See, e.g., El Dorado Motors, Inc.,* 168 S.W.3d at 366; *Newton v. Meade,* 143 S.W.3d 571, 573–75 (Tex.App.-Dallas 2004, no pet.) (award of attorney's fees for legal malpractice not sustainable because client did not recover under breach of contract but under negligence); *City of Garland v. Booth,* 895 S.W.2d 766, 771–72 (Tex.App.-Dallas 1995, writ denied) (declining to award as damages in separate malpractice action attorney's fees expended to disqualify opponent's attorney in prior litigation). We have expressly declined to adopt an equitable exception to this general rule.

In support of its position, NDR cites *Estate of Arlitt v. Paterson,* 995 S.W.2d 713 (Tex.App.-San Antonio 1999), *overruled on other grounds by Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.,* 192 S.W.3d 780, 783 (Tex.2006). The San Antonio court permitted the recovery of attorney's fees as damages in that case, but did note two decisions of this Court holding to the contrary. *Id.* at 721 (citing *Booth,* 895 S.W.2d at 771–72, and *Peterson v. Dean Witter Reynolds, Inc.,* 805 S.W.2d 541, 549 (Tex.App.-Dallas 1991, no writ)). NDR failed to cite this controlling authority in this Court.

Based on the binding authority of our previous decisions, we conclude that NDR's appellate attorney's fees are not recoverable as an element of damages in its separate legal malpractice action against Akin Gump. Accordingly, the trial court erred by granting judgment including this element of damages.

We sustain Akin Gump's third issue and modify the judgment to delete the award of $216,590 in attorney's fees as actual damages in this suit.

### REDUCTION OF DAMAGES BY CONTINGENCY FEE

■■■ In its fourth issue, Akin Gump argues we should reduce the verdict by the 10% contingency fee NDR would have owed Akin Gump had NDR prevailed in the Panda lawsuit. The trial court entered judgment based on the jury's verdict, effectively denying Akin Gump's request for an offset. Because the issue of whether damages for malpractice should be reduced to reflect a contingency fee is a question of law, we review the trial court's ruling de novo. *See Ferry v. Sackett,* 204 S.W.3d 911, 912 (Tex.App.-Dallas 2006, no pet.) (pure questions of law reviewed de novo).

■■■ The general rule in the United States and Texas is that, unless authorized by contract or statute, each party must bear its own costs of litigation. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 269, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.,* 835 S.W.2d 75, 77 (Tex. 1992). The parties agree that whether damages in a malpractice suit should be reduced by a contingency fee is an issue of first impression in Texas. Jurisdictions that have considered this issue have disagreed about the propriety of such an offset.

Some jurisdictions have held that damages should be reduced by the amount of a contingency fee because not to do so violates the basic tort rule that damages are compensatory only and must not put plaintiff in a better position than she would have been in absent the tort. *See, e.g.,*

*Moores v. Greenberg*, 834 F.2d 1105, 1111–113 (1st Cir.1987) (applying Maine law); *Sitton v. Clements*, 257 F.Supp. 63, 66 (E.D.Tenn.1966), *aff'd*, 385 F.2d 869 (6th Cir.1967); *McGlone v. Lacey*, 288 F.Supp. 662, 665 (D.S.D.1968); *Horn v. Wooster*, 2007 WY 120, ¶ 15, 165 P.3d 69 (Wyo., 2007); *Ramp v. St. Paul Fire & Marine Ins. Co.*, 263 La. 774, 269 So.2d 239, 245–46 (.1972); *Childs v. Comstock*, 69 A.D. 160, 169, 74 N.Y.S. 643, 649 (N.Y.App.Div.1902), *disagreed with by Andrews v. Cain*, 62 A.D.2d 612, 613, 406 N.Y.S.2d 168, 169 (N.Y.App.Div.1978); *see also* John E. Theuman, *Measure and Element of Damages Recoverable for Attorney's Negligence in Preparing or Conducting Litigation*, 90 A.L.R.4th 1033 § 14(a)-(c) (2006) (comparing conflicting views); Samuel J. Cohen, *The Deduction of Contingent Attorneys' Fees Owed to the Negligent Attorney from Legal Malpractice Damage Awards: The New Modern Rule*, 24 Tort & Ins. L.J. 751, 761 (1989) (same).

Other jurisdictions have held that damages should not be reduced by the amount of a contingency fee on two grounds. First, the offset credits the negligent attorney with a fee he failed to earn and somewhat rewards his wrongdoing; and second, the deduction fails to fully compensate the plaintiff who has been required to incur new attorney's fees and expenses to recover the judgment it should have won in the trial court. *See, e.g., Duncan v. Lord*, 409 F.Supp. 687, 691 (E.D.Pa.1976) (deduction fails to fully compensate plaintiff); *Carbone v. Tierney*, 151 N.H. 521, 534–35, 864 A.2d 308, 319–20 (N.H.2004) (same); *Campagnola v. Mulholland, Minion & Roe*, 148 A.D.2d 155, 543 N.Y.S.2d 516, 518–19 (N.Y.App.1989) (deduction rewards wrongdoing and fails to fully compensate plaintiff); *Kane, Kane & Kritzer, Inc. v. Altagen*, 107 Cal.App.3d 36, 44, 165 Cal.Rptr. 534, 538 (Cal.Ct.App.1980) (same); *Togstad v. Vesely, Otto, Miller &*

*Keefe*, 291 N.W.2d 686, 696 (Minn.1980) (deduction rewards wrongdoing); *Andrews v. Cain*, 62 A.D.2d 612, 613, 406 N.Y.S.2d 168, 169 (N.Y.App.Div.1978) (deduction rewards wrongdoing and fails to fully compensate plaintiff); *Winter v. Brown*, 365 A.2d 381, 386 (D.C.1976) (deduction fails to fully compensate plaintiff); *see also* Theuman, *supra*, at § 14(a)-(b) (and cases cited therein); *see generally* Cohen, *supra*, (and cases cited therein).

Some of the jurisdictions expressing a general rule that damages should not be reduced by a contingency fee have adopted a "middle-road approach," allowing some reduction on a quantum meruit basis. *See Schultheis v. Franke*, 658 N.E.2d 932, 941 (Ind.Ct.App.1995); *Strauss v. Fost*, 213 N.J.Super. 239, 242–43, 517 A.2d 143, 145 (N.J.Super.Ct.App.Div.1986); *Foster v. Duggin*, 695 S.W.2d 526, 527 (Tenn.1985). These courts have reasoned that circumstances may exist where the efforts of the otherwise negligent attorney rendered some beneficial services to the plaintiff, making it unfair to deny some credit for the contingency fee. *See, e.g., Schultheis*, 658 N.E.2d at 941. Under this rationale, the jury would be required to determine whether the negligent lawyer provided services benefiting the plaintiff and, if so, to assign a value to those services and reduce the damages award accordingly. *See Carbone*, 864 A.2d at 320.

Akin Gump urges us to adopt the view that a malpractice award must be reduced by the amount the client would have owed the attorney under a contingency fee agreement, because to do so comports with well-established principles of tort and legal malpractice compensation. Otherwise, Akin Gump argues, the client would be placed in a better position than he would have been in but for his attorney's negligence. NDR responds that granting an offset for the contingency fee will fail to

put it in the position it would have been in but for Akin Gump's negligence because of the expense of hiring new attorneys to collect the damages that would have been awarded in the Panda suit.

Ordinarily, an attorney would seek to recover his contingency fee through a breach of contract action. But if the attorney did not prevail in the underlying litigation, the contingency fee has not been earned, and there is no viable breach of contract action for recovery of the fee. A quantum meruit theory is an alternative avenue to recover all or part of a contingency fee based on services rendered. But on this record, Akin Gump could not prevail on a quantum meruit basis because the jury found that Akin Gump did not render *any* compensable services to NDR in the Panda lawsuit.[11]

 Akin Gump was entitled to its contingency fee only if NDR *prevailed* in the Panda lawsuit. Due to Akin Gump's negligence, NDR did not prevail and thus Akin Gump did not *earn* its contingency fee. To give the firm a credit for a contingency fee it failed to earn would be to reward its wrongdoing. To secure the damages it would have been awarded in the Panda lawsuit, NDR was required to pay two sets of lawyers and endure the aggravation of a second lawsuit and a second appeal. The attorney's fees and expenses incurred to prosecute a legal malpractice suit are not recoverable as damages, absent some statute or agreement not applicable here. *See El Dorado Motors, Inc.,* 168 S.W.3d at 366; *Booth,* 895 S.W.2d at 771–72. Simply put, NDR must pay attorneys twice to be in the

same position it would have been in absent Akin Gump's malpractice. It should not be forced to "pay" a contingency fee that Akin Gump never earned. As we have noted, the jury in the malpractice suit found that Akin Gump performed no compensable services to NDR. Accordingly, we conclude that the judgment should not be offset by any contingency fee agreement in the underlying lawsuit. Therefore, the trial court did not err by effectively denying Akin Gump's request to reduce the damages by the amount of the contingency fee in the underlying suit.

We overrule appellant's fourth issue.

### CONCLUSION

We modify the trial court's judgment to delete the award of $216,590 in attorney's fees, reducing the actual damages to $706,041.86, and affirm the judgment in every other respect. We remand to the trial court for the recalculation of interest on the judgment as modified.

11. The jury charge asked:
Did Akin Gump perform compensable work for NDR?
A party performs "compensable work" if valuable services are rendered for another party who knowingly accepts and uses them, and if the party accepting them should know that the performing party expects to be paid for the work.
Answer "Yes" or "No."
**Answer: NO**